50 CCPA

**MOTOROLA, INC., Appellant,**

v.

**GRIFFITHS ELECTRONICS, INC., Appellee.**

**Patent Appeal No. 6969.**

United States Court of Customs and Patent Appeals.

May 16, 1963.

Foorman L. Mueller, Chicago, Ill. (Daphne Robert Leeds, Washington, D. C., of counsel), for appellant.

Fred L. Witherspoon, Jr., Washington, D. C., for appellee.

Before WORLEY, Chief Judge, and RICH, MARTIN, SMITH, and ALMOND, Judges.

RICH, Judge.

Motorola, Inc. opposes the registration of "THE GOLDEN GRID" on the Principal Register by Griffiths Electronics, Inc., which filed application Ser. No. 44,-276, January 20, 1958, claiming first use of the mark on October 14, 1957. The Trademark Trial and Appeal Board dismissed the opposition, 132 USPQ 565 and 568.

Applicant-appellee seeks to register the above mark "for Electron Guns for Television Tubes and Other Electronic Devices and for the No. 1 Grid for Such Tubes and Devices." The word "grid" is the name of one of the articles enumerated in the application and by amendment applicant inserted the following disclaimer: "The word 'GRID' is disclaimed apart from the mark as shown." The "No. 1 Grid" is, furthermore, an element of the electron gun, also enumerated. The word "GRID" in the mark sought to be registered is, therefore, purely descriptive of the enumerated goods and without trademark significance. The specimen filed with the application is a label showing a drawing of the goods across the top of which are the words, "LOOK FOR THE GRID WITH THE LID" and beneath which is the mark "THE GOLDEN GRID."

Neither party took testimony. Both parties filed stipulations of facts with exhibits and applicant noticed certain material under Patent Office Rule 1.282 (as authorized by Trademark Rule 2.123 (c)). Thus there is no issue as to any fact. We have before us only questions of law and the basic issue is likelihood of confusion, mistake or deception under section 2(d) of the Trademark Act of 1946 (15 U.S.C. 1052(d)).

Applicant's stipulation states, inter alia,

"3. Applicant makes electron guns for television picture tubes and cathode ray tubes and the No. 1 grid for such guns, and it sells such items to the manufacturers of products which embody such products as components."

With respect to the use of the mark sought to be registered on such products, the application states:

"The mark is used by applying it to the box in which the grids or electron guns are packed singly or in multiple and is eventually applied to the finished television tube or other electronic device by applying a label as included herewith to the surface of the enclosing envelope of the tube; * * *."

The "label as included herewith" we take to be the specimen label.

Notwithstanding the designation of the mark in its application, appellee argues the case on the basis that the mark is "GOLDEN GRID," ignoring the "THE," which is indeed of trifling importance. This leaves the word "GOLDEN" as the only part of the total mark having trademark significance.

Opposer-appellant, stipulated to be a manufacturer and vendor of radio and television receivers, phonographs, two-way radio systems, microwave relay systems, and parts for all of the foregoing including vacuum tubes of all kinds and TV picture tubes, is admittedly the prior user and registrant of a series of "Golden" marks therefor including the following:

GOLDEN VOICE, Reg. No. 513,988, for radio receivers, since 1935 and Reg. No. 685,813, for loudspeakers, since 1955.

Golden View, Reg. No. 513,987, for television receivers, since 1947.

GOLDEN BEAM, Reg. No. 535,305, for radio antennas, since 1948.

Golden Heart (unregistered) for transistors, since 1956.

GOLDEN M, Reg. No. 685,815, for vacuum tubes and for television receiver chassis, since July 1957.

GOLDEN SATELLITE, Reg. No. 685,815, for vacuum tubes and tele-

vision receiver chassis, since July 1957.

In registrations Nos. 513,988, 513,987 and 535,305 the words "VOICE," "View," and "BEAM," respectively, are disclaimed.

Opposer also has five other "Golden" marks as a result of its own use which commenced *later* than applicant's use and during the pendency of this proceeding acquired three more by assignment, which it is now using. We find it unnecessary to consider specifically these eight marks for they do no more than to augment a picture sufficiently shown by the marks of opposer in prior use.

Opposer and applicant are obviously in the same general field of business, i. e., electrical and electronic manufactures and parts therefor, and what one sells might very well be supposed to have its origin with the other when sold under a mark so similar as to be likely to cause confusion. Opposer's business in this field has been substantial, the stipulation showing that it sells through 98 distributors who sell, in turn, to more than 23,000 retailers and about 25,000 service and repair organizations. We quote two paragraphs of the stipulation on volume of sales and cost of advertising:

"20. The value of products sold by Opposer since 1935, in connection with which one or more of its trademarks having "GOLDEN" as a component thereof was used, is in excess of $230,000,000; and more than $12,-000,000 have been spent in advertising such products under the said trademarks.

"21. The value of replacement parts and components, many of which are identified by one of Opposer's trademarks having "GOLDEN" as a component thereof, sold by Opposer averages about $3,000,000 annually."

While it is true, as appellee says, that the record is silent on apportionment of the above sales and advertising to the periods before and after appellee's entry into the field in October 1957, considering that the former period is 22 years and

the latter period a little over 2 years, we think this failure is of no moment. Sales and advertising of goods under marks having "Golden" as a component prior to appellee's entry into the field must have been very substantial. The exact amount is quite unimportant.

Before appellee's first use of the mark, opposer was already established in the television receiver field with several "Golden" trademarks. The exhibits show that marks of which "Golden" is a component were used, displayed, and advertised *together* prior to appellee's date of first use. Whether or not the situation is categorized as one in which opposer has a "family" of marks—appellee contending that it is not—we agree with opposer's contentions that prior to the earliest use of appellee's mark opposer had established a pattern of using marks comprising "Golden" as the *dominant* feature on electronic goods in the radio and television industries and that appellee's use of its mark fell into that pattern.

In our judgment, it is quite likely that at least a substantial number of purchasers or users of appellee's electron guns, grids, or the TV picture tubes bearing the labels indicating that they are incorporated therein—which is a manner of marking specified in the application practiced by appellee's customers—would attribute origin to opposer. This is sufficient reason, under section 2(d), for denying registration.

While, as the board pointed out in its opinion on reconsideration, the "Golden" marks were used together in conjunction with the primary mark "Motorola," this strikes us as a fact of little significance. If a TV receiver contains a "GOLDEN M" chassis, "GOLDEN M" and "GOLDEN SATELLITE" vacuum tubes, all originating with Motorola, it would seem to be more than likely that one would expect a picture tube for the same set, either original or replacement, bearing a "GOLDEN GRID" label, to have had the same origin. Were it otherwise, the significance of the word "Golden" as an indicator of origin would be close to zero. Insofar as it would serve to indicate origin, we think it would be as likely

to indicate origin in opposer as in appellee. The annexation of the word "grid" to the word "golden" would not alter this by reason of the fact that "grid" is purely descriptive. The board seemed to feel that it would be otherwise, saying, "the word 'GRID' in applicant's mark, while of a merely descriptive nature, is still sufficient to distinguish applicant's mark from each of opposer's marks." We cannot agree. Furthermore, the issue is not whether the *marks* can be distinguished, but whether in concurrent use on the goods involved they are likely to cause confusion, mistake, or deception.

There are ten third-party registrations of record on marks comprising two words the first of which is "Golden" and used on various goods in the electrical field. The board considered five of these pertinent to this appeal. Appellee also introduced copies of some advertisements in which the word "GOLDEN" was used in various ways. This evidence, plus the dictionary meanings of "golden" led the board to conclude that "such term has a highly suggestive significance." In view of this undoubted fact and the indication that others than opposer may have used the word "Golden" in the electrical field, the board concluded that opposer had not established that it had a "family" of "Golden" marks, despite its extensive use and advertising thereof. As a matter of logic it would seem to us that if opposer has a family of six marks all starting with the non-descriptive word "Golden," it still has that family notwithstanding there may be some others using the same word to some undisclosed extent.

The board supported its conclusion that no likelihood of confusion could exist between appellee's mark and those of appellant by citing three of our decisions which we find distinguishable for reasons we shall now point out.

Lauritzen & Company, Inc. v. Borden Company, 239 F.2d 405, 44 CCPA 720, involved marks for milk products ending in "-lac" which we found to be a *descriptive* term, being the Latin for milk. We agreed with both lower tribunals that the presence of "-lac" in a mark on a milk product would not indicate origin to the public. We agreed that it was no basis for finding the existence of a family of marks and held it should be given little weight in determining whether marks for milk products are "confusingly similar," which is a shorthand expression indicating that we do not think concurrent use of the marks is likely to *cause* confusion.

Burroughs Wellcome & Co. (U. S. A.) Inc. v. Mezger Pharmacal Co., Inc., 228 F.2d 243, 43 CCPA 703, also involved a three-letter suffix, "-fax." While this does not appear to have a current dictionary meaning in modern English,[1] the record showed it to be rather commonly used in the medicinal field involved. We said that the opposer's case could not depend on any proprietary interest in the final syllable "-fax." The opposer had a string of marks all ending in "-fax" but otherwise they had nothing in common with each other or with the applicant's mark. For that reason we held, of necessity, that opposer's marks had to be compared *individually* with applicant's mark, for with "-fax" laid aside, the opposer's marks had no common feature to be compared with the applicant's mark.

Servo Corporation of America v. Servo-Tek Products Co., Inc., 289 F.2d 955, 48 CCPA 978, involved marks having the prefix "servo-" for servomechanisms. We found that nobody had an exclusive right to the term "servo" in connection with servomechanisms. While we did not say it in so many words, we found "servo" to be *descriptive*, as is obvious from the dictionary definitions quoted. We found opposer could not rely on the "servo" portion of any of its marks in opposing the registration of "Servospeed."

We can see no parallel between any of these cases and the case now before us. "Golden" as used by appellant-opposer is not descriptive of its goods. The fact

1. The Oxford Dictionary shows it to be an obsolete term meaning the hair of the head in Old English and mentions the names Fairfax and Halifax.

that "Golden" as so used may be "suggestive" is not in and of itself a reason why trademark significance may not attach thereto. We believe that appellee's mark, used *as indicated in the application on the goods there named*, would appear to many to be a member of opposer's family. We agree with the board's factual holding that "the purchasers of television tubes may well encounter the marks of both parties on the same product." Under these circumstances we see no possibility of avoiding the conclusion that there is a likelihood of confusion except, as previously indicated, by reducing the origin-indicating value of the word "Golden," as used in opposer's marks, to the vanishing point. The evidence does not justify doing this.

The decision of the board dismissing the opposition is reversed.

Reversed.