In the

# United States Court of Appeals
### For the Seventh Circuit

No. 02-1816

AM GENERAL CORPORATION and
GENERAL MOTORS CORPORATION,

*Plaintiffs-Appellees,*

*v.*

DAIMLERCHRYSLER CORPORATION,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Indiana, South Bend Division.
No. 01-CV-0134—**Robert L. Miller, Jr.**, *Judge.*

ARGUED OCTOBER 16, 2002—DECIDED NOVEMBER 18, 2002

Before BAUER, COFFEY, and WILLIAMS, *Circuit Judges.*

BAUER, *Circuit Judge.* Plaintiffs AM General Corporation ("AM General") and General Motors Corporation ("GM") brought a declaratory judgment action in the district court asking the court to find that the front-end grille design of their recently developed H2[1] sport utility

---

[1] The Plaintiffs currently produce three lines of vehicles relevant to this appeal. The "Humvee" originated as a military vehicle in

(continued...)

vehicle ("SUV") does not dilute or infringe upon a trademark held by the Defendant, DaimlerChrysler Corporation ("DaimlerChrysler"), for a similar looking grille on DaimlerChrysler's line of Jeep SUVs. DaimlerChrysler then filed a motion for a preliminary injunction against GM's use of the grille design on the then yet-to-be released H2.[2]

After an eight-day hearing on the matter, the district court denied DaimlerChrysler's preliminary injunction finding: 1) that DaimlerChrysler showed virtually no chance of success on the merits of either its federal dilution or infringement claims; and 2) that, even if DaimlerChrysler did show a better than negligible chance of winning on the merits, the balance of harms weighed heavily against issuing the injunction.

DaimlerChrysler timely filed this appeal and raised the following issues: 1) whether the district court erred in applying the doctrine of progressive encroachment to its dilution claim by finding that laches barred the claim even though prior sales of H1 vehicles occurred in a different market than the mainstream SUV market where the H2 is

---

[1] (...continued)
the early 1980s and was later released for consumer sales in 1992 as the "Hummer." The Hummer is now known, however, as the H1. In late 1999, GM and AM General announced a partnership to produce a smaller version of the H1, to sell within the mainstream sport utility vehicle market, known as the H2. It is the sale of the H2 that concerns DaimlerChrysler.

[2] DaimlerChrysler's preliminary injunction sought to prohibit GM and AM General from launching sales of the H2 to the public with the grille design currently used on the vehicle. GM and AM General planned on introducing the H2 in July 2002 and during the pendency of this appeal were able to do so. DaimlerChrysler argues that this appeal is not moot and asks this Court to remand the case for a new preliminary injunction hearing because further sales of the H2 could be enjoined by the district court.

being sold; 2) whether the district court erred in finding that DaimlerChrysler must prove that its grille design achieved fame or distinctiveness before AM General or GM began using a similar design in a different market; and 3) whether the district court improperly balanced the harms of issuing the injunction by finding that the harm to GM, AM General, and the public interest outweighed DaimlerChrysler's presumptive harm from the alleged dilution or infringement.

Because the district court issued a thorough and well-reasoned memorandum opinion and order that does not contain any error, we adopt the district court's opinion dated February 28, 2002, as our own and AFFIRM the judgment of the lower court on all counts. Because the memorandum opinion and order was not published, it is appended below.

MEMORANDUM AND ORDER

This case is before the court on a motion for preliminary injunctive relief based solely on claims of trademark dilution and infringement arising under the Lanham Act, 15 U.S.C. §§ 1051 *et seq.*[3] General Motors Corporation and AM General Corporation filed this suit, principally as a declaratory judgment action, against DaimlerChrysler Corporation, but DaimlerChrysler seeks the preliminary injunction. DaimlerChrysler's counterclaims against General Motors and AM General allege that DaimlerChrysler owns protectable trademark rights in a family of designs of the grilles of its Jeep vehicles, and General Motors and AM General intend to use a grille on a forthcoming vehicle that

---

[3] This court has original jurisdiction over the subject matter of this action pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331 and 1338.

will infringe and dilute DaimlerChrysler's family of marks. DaimlerChrysler does not seek an injunction against AM General, but since AM General is a party to the suit and would be affected greatly by the requested injunction, the court allowed AM General to participate fully in the evidentiary hearing that took place from February 6-15, 2002.

The case involves two brands of motor vehicles (or perhaps more accurately, sport utility vehicles). One brand is Jeep. DaimlerChrysler owns the Jeep brand as the successor corporation to Chrysler Corporation, American Motors Corporation, Jeep Corporation, Kaiser Jeep Corporation, Willys Motors, Inc., and Willys-Overland Motors, Inc. The court will refer to DaimlerChrysler Corporation and all its predecessors in the Jeep brand simply as "DaimlerChrysler." The history of the Jeep brand (and the pertinent grille configurations) is set forth in Part B of this opinion.

The other brand of sport utility vehicle, or "SUV," is the Hummer brand, which has a far shorter biography. Part C of this opinion relates that history in some detail. Briefly, the Hummer was the civilian younger sibling of the military Humvee; both the Hummer and the Humvee were owned and produced by AM General Corporation, which was itself part of other companies (including a Jeep predecessor to DaimlerChrysler) throughout the vehicles' histories. In 1999, AM General sold the Hummer brand to General Motors Corporation. General Motors is producing (though not yet selling) a lower-priced version of the AM General Hummer. The companies now refer to the new, General Motors Hummer as the "H2" and to the old AM General Hummer as the "H1." AM General is to assemble the H2 under contract with General Motors and continues to produce the H1 and the Humvee.

For the reasons that follow, the court denies the motion for preliminary injunction.

## A. PARTIES' POSITIONS AND APPLICABLE LEGAL PRINCIPLES

This case is about Jeep grilles and the grille General Motors plans to use on the H2. DaimlerChrysler contends that it has a family of marks that have featured consistent and easily recognized common grille characteristics: seven to ten vertical slots that appear to be stamped through a planar surface. DaimlerChrysler calls this configuration the Jeep grille design.

As the party seeking the preliminary injunction, Daimler-Chrysler has the burden of demonstrating that it has a reasonable likelihood of success on the merits of its underlying claim, that it has no adequate remedy at law, and that it will suffer irreparable harm without the preliminary injunction; if DaimlerChrysler meets those burdens, the court then must consider any irreparable harm the preliminary injunction might impose upon General Motors (the only party against which the injunction is sought) and whether the preliminary injunction would harm or foster the public interest. *Anderson v. U.S.F. Logistics (IMC), Inc.*, 274 F.3d 470, 474 (7th Cir. 2001); *Re/Max North Central, Inc. v. Cook*, 272 F.3d 424, 429-30 (7th Cir. 2001).

A party with no chance of success on the merits cannot attain a preliminary injunction. *Kiel v. City of Kenosha*, 236 F.3d 814, 815 (7th Cir. 2000). In the first phase of the analysis, the court decides only whether the plaintiff has any likelihood of success—in other words, a greater than negligible chance of winning, *Washington v. Indiana High Sch. Ath. Ass'n*, 181 F.3d 840, 845 (7th Cir. 1999)—but in the second phase, the court evaluates that likelihood of success, *Storck USA, L.P. v. Farley Candy Co.*, 14 F.3d 311, 314 n.1 (7th Cir. 1994), as the analysis turns to a "sliding scale" under which a lesser likelihood of success can be made sufficient by a greater predominance of the balance of harms. *Ty, Inc. v. The Jones Group, Inc.*, 237 F.3d 891, 895

(7th Cir. 2001); *Eli Lilly & Co. v. Natural Answers, Inc.*, 233 F.3d 456, 461 (7th Cir. 2000). In performing this balancing, the court bears in mind that the purpose of a preliminary injunction is "to minimize the hardship to the parties pending the ultimate resolution of the lawsuit." *Platinum Home Mortgage Corp. v. Platinum Financial Group, Inc.*, 149 F.3d 722, 726 (7th Cir. 1998) (*quoting Faheem-El v. Klincar*, 841 F.2d 712, 717 (7th Cir. 1988)).

To prevail on the merits of either of its claims, Daimler-Chrysler must show that it has a protectable mark—in this case, a "family of marks," which ordinarily means a group of marks, each individual member of which uses a common element that consumers associate with the mark's owner. *Spraying Sys. Co. v. Delavan, Inc.*, 975 F.2d 387, 395 (7th Cir. 1992). The marks to which DaimlerChrysler points consist of trade dress that varies with respect to the number of slots.

To prevail at trial on its dilution claim under 15 U.S.C. §§ 1125(c) and 1127, DaimlerChrysler will have to prove that its family of marks was famous before General Motors adopted the intended H2 grille, that General Motors's use of the intended H2 grille is in commerce, and that General Motors's use of the intended H2 grille is likely to dilute DaimlerChrysler's family of marks. *Eli Lilly & Co. v. Natural Answers, Inc.*, 233 F.3d at 466; *Syndicate Sales, Inc. v. Hampshire Paper Corp.*, 192 F.3d 633, 639 (7th Cir. 1999). Unlike a trademark infringement claim, a dilution claim requires no showing of consumer confusion as to source. 15 U.S.C. § 1127.

In deciding whether DaimlerChrysler's family of marks is "famous" within the meaning of the statute, the court is to consider the family's inherent distinctiveness or secondary meaning, the time and extent of DaimlerChrysler's use of the family in connection with motor vehicles, the duration and extent of DaimlerChrysler's advertising and pub-

licity of the family, the size of the trading area in which DaimlerChrysler uses the family of marks, the channels of trade for motor vehicles, the degree of recognition of the family in those trading areas and channels of trade, whether and how others use similar marks, and whether the family is registered. 15 U.S.C. § 1125(c)(1).

In deciding whether General Motors's intended H2 grille is likely to dilute DaimlerChrysler's family of marks, the court must consider the similarity of the grilles and the strength of the DaimlerChrysler family. *Eli Lilly & Co. v. Natural Answers, Inc.*, 233 F.3d at 468. The type of dilution that DaimlerChrysler alleges is "blurring," which a leading treatise describes as the risk that "[c]ustomers or prospective customers will see [DaimlerChrysler's] mark used by other persons to identify other sources on a plethora of different goods and services. The unique and distinctive significance of the mark to identify and distinguish one source may be diluted and weakened. But no confusion as to source, sponsorship, affiliation or connection has occurred." 4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 24:68, at 24-120 (4th ed. 2001).

DaimlerChrysler contends that its trade dress family has trademark priority over the intended H2 grille in the mainstream SUV market, and that as a result, DaimlerChrysler need only prove that its family is distinctive and famous as of today, citing *Johnny Blastoff v. Los Angeles Rams Football Co.*, 188 F.3d 427, 434 (7th Cir. 1999).

To prevail at trial on its trademark infringement claim, DaimlerChrysler will have to prove that its family of marks is distinctive and that the intended H2 grille is likely to cause consumers to believe mistakenly that the H2 is manufactured, sponsored, or endorsed by, or affiliated or connected with, the Jeep brand. *Johnny Blastoff, Inc. v. Los Angeles Rams Football Co.*, 188 F.3d at 436. In determining likelihood of confusion, the court considers the type of

trademark in issue, the similarity of the designs and the products, the identity of retail outlets and purchasers, identity of advertising media utilized, any evidence of actual confusion, and whether General Motors intends to pass off its product as that of DaimlerChrysler. *Thomas & Betts Corp. v. Panduit Corp.*, 138 F.3d 277, 296 (7th Cir. 1998). DaimlerChrysler points particularly to the likelihood of "initial interest confusion," which occurs when a consumer is lured to a competing product by the competitor's similar trade dress. *Eli Lilly v. Natural Answers*, 233 F.3d at 464.

With respect to irreparable harm, DaimlerChrysler relies on the law's presumption that trademark dilution or infringement threatens irreparable injury for which there is no adequate remedy at law. *Abbott Lab. v. Mead Johnson & Co.*, 971 F.2d 6, 16 (7th Cir. 1992); *International Kennel Club, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1092 (7th Cir. 1988). DaimlerChrysler contends that H2 vehicles (and their grilles) will become rolling billboards on the nation's highways, and that DaimlerChrysler will lose its ability to control the nature and quality of the vehicles associated with Jeep vehicles.

General Motors, DaimlerChrysler contends, will not suffer significant irreparable harm if a preliminary injunction is issued and later found to be in error. General Motors has designed an alternative grille for the H2. Depending on the extent of pre-launch testing General Motors chooses to do, DaimlerChrysler contends, the production of the H2 would be delayed by no more than eight weeks, if it is delayed at all. The public interest favors the injunction, Daimler-Chrysler contends, because the enforcement of trademark laws protects consumers from confusion.

DaimlerChrysler contends that its trade dress family is not functional, noting that nearly every other motor vehicle manufacturer has managed to find a way to cool the engine

without using vertical slots. General Motors contested this point in its pre-hearing briefs, but presented no evidence or argument at the hearing to refute DaimlerChrysler's contention on nonfunctionality. DaimlerChrysler's position seems right and is unrebutted, so the court assumes for today's ruling that the grille configurations on Jeep models are not functional and have not been functional.

General Motors contends that DaimlerChrysler is judicially estopped from claiming trademark protection for the trade dress family or that the intended H2 grille dilutes and infringes that family because DaimlerChrysler did not identify either the H1 grille or earlier Jeep grilles as prior art in its 1999 application for a design patent on the Jeep Grand Cherokee grille. DaimlerChrysler argues that there is no inconsistency between its position then and its position today because different standards govern design patent protection (and what constitutes invalidating prior art) and trademark protection.

General Motors also asserts an affirmative defense of laches, contending that DaimlerChrysler unreasonably delayed in objecting to the intended H2 grill, first from 1983 to 1991, while AM General was selling the Humvee, then from 1992 to 1999, while AM General was selling the H1, and then from June 1999 to December 1999, the time between the announcement of General Motors's acquisition of the Hummer brand and General Motors's announcement of the H2.

With respect to 1983-1991, DaimlerChrysler contends that it had licensed AM General to use the Jeep grille design on the Humvee, so DaimlerChrysler could have taken no reasonable action. With respect to 1992-1999, DaimlerChrysler contends that since AM General had represented, in the course of registering its trademark, that the H1 didn't compete with any Jeep product, DaimlerChrysler's failure to object could have led to rea-

sonable reliance on DaimlerChrysler's silence. The remaining six months in 1999, DaimlerChrysler says, simply is too brief a time to support a laches defense. DaimlerChrysler also relies on the doctrine of progressive encroachment, which tolerates inaction by the owner of a mark until the threat to the mark grows into substantiality. Until the announcement of the H2, DaimlerChrysler argues, the Hummer vehicles were not a matter of concern because they constituted a market unto themselves. DaimlerChrysler argues that the doctrine of progressive encroachment is available to one claiming dilution as well as to one claiming infringement; General Motors disagrees.

## B. JEEP BRAND HISTORY

The Jeep became well-known as an American military vehicle during World War II. In 1940, Willys-Overland Motors, Inc. produced a prototype for the nation's first quarter-ton military truck, won the production contract through a competitive bidding process, and in 1941, began producing what would become 350,000 Jeeps for the war effort.

As peace followed war in 1945, a commercial version of the Jeep appeared for sale to retail consumers. Willys-Overland manufactured the first civilian Jeep, employing the military Jeep's grille design of seven perfectly vertical slots that appear to have been stamped through a solid sheet of metal. As discussed in the next section, AM General also traces its corporate heritage back to Willys-Overland Motors.

Jeep models for consumers came and went in the ensuing years, with periodic change in the brand's ownership. Henry J. Kaiser purchased Willys-Overland in 1953, and the company became Willys Motors, Inc. which continued to manufacture Jeeps (and considerable lines of military and postal vehicles) until 1963, when the company's name was

changed to Kaiser Jeep Company. In 1964, in the wake of the demise of the Studebaker Corporation as a motor vehicle manufacturer, Kaiser Jeep acquired a Studebaker plant in South Bend, Indiana, and assumed a Studebaker contract for the production of military trucks and produced postal trucks of varying sizes. In 1967, Kaiser Jeep formed a Defense and Government Products Division to deal exclusively with government vehicles.

Kaiser Jeep manufactured the Jeep line from 1962 until 1970, when American Motors Corporation purchased Kaiser Jeep from Kaiser Industries. In 1971, American Motors Corporation established two wholly owned subsidiaries: Jeep Corporation, and AM General Corporation, which previously had been the Defense and Government Products Division.

Jeep Corporation continued to produce a product line of Jeep vehicles as an American Motors subsidiary until 1987. Its sister corporation, AM General, continued to develop products for use as military and postal vehicles, and to build them pursuant to contracts awarded by the government. In 1979, AM General started preliminary design work on the "M998 Series High Mobility Multi-Purpose Wheeled Vehicle"—the "HMMWV," in the inevitable governmental acronym, or "Humvee," as it came to be named for purposes of verbal communication. After being awarded a prototype contract in 1981, AM General was awarded a $1.2 billion contract to produce 55,000 Humvees over a five-year period (eventually increased to $1.6 billion to produce 70,000 Humvees).

Also in 1983, LTV Corporation acquired AM General from American Motors, and established AM General as a wholly owned subsidiary of the LTV Aerospace and Defense Company. AM General was awarded contracts for the production of more Humvees in 1989 and 1994.

In 1987, Chrysler Corporation acquired American Motors Corporation, and with it, Jeep Corporation. Chrysler con-

tinued (and from time to time, modified) the Jeep line. A 1998 merger eliminated the Chrysler Corporation and produced DaimlerChrysler Corporation, which continues to produce the Jeep line of vehicles. Except for the period in which AM General and Jeep Corporation were American Motors subsidiaries, the precise corporate identity of the producer of civilian Jeeps is unimportant to today's decision.

Jeep, now on the scene in one form or another for sixty years, is widely known. For many years, Jeep was the only manufacturer of four-wheel drive sport utility vehicles; that monopoly within what was then a niche market (in comparison, there are now fifty-two models of SUVs available in the United States) focused the brand's prominence. Jeeps, and their grilles, have been depicted prominently in military movies, television shows, toys, other licensed products, and in billions of dollars of advertising. DaimlerChrysler has obtained three federal trademark registrations that encompass its grille designs; all depict what appears to be a variant of the grille used on today's Jeep Wrangler and Jeep Liberty. The first registration, which reported a first use of 1941, was issued in 1981 for "land vehicles." The second registration, which reported a first use in commerce of March 10, 1986, was issued in 1987 for "utility land vehicles." The third registration, which reported a first use in commerce of January 1, 1996, was issued in 1998 for "sport utility vehicles." The first two registrations no longer are being used in the production of Jeep models; whether DaimlerChrysler still produces either of those grilles for use as replacement parts was unclear from the evidence at the hearing.

Since 1945, DaimlerChrysler has sold tens of millions of Jeep vehicles with what it calls the Jeep grille design. DaimlerChrysler has advertised its vehicles down through the years, with DaimlerChrysler and its dealers and distributors spending billions of dollars on nationwide adver-

tising and promotions that featured the grille. The grille that appears on today's Wrangler (and its headlamp openings) appears prominently on many products shown in the "Jeep Provisions Catalog," and is the symbol of an annual Jeep homecoming event called "Camp Jeep."

Today, DaimlerChrysler sells three Jeep models: the Wrangler, the Grand Cherokee, and the Liberty. Daimler-Chrysler discontinued a fourth model, the Cherokee, in 2001.

## C. History of the Humvee and the Hummer

As already noted, AM General won the contract to produce the Humvee for the military during the rebuilding of the United States armed forces in the 1980s. In February 1981, the U.S. Government invited proposals for a new High Mobility Multipurpose Wheeled Vehicle, and AM General was one of five companies that submitted proposals. AM General's Technical Proposal included drawings depicting the design of AM General' s proposed Humvee vehicle, including a grille design with nine vertical pill-capsule-shaped slots that were slightly taller than the round headlights that "bookended" the slots.

AM General was among three companies awarded "Phase I" contracts in July 1981; those contracts provided funding for production of prototype HMMWV vehicles for the U.S. military to test. In July 1982, AM General applied to the U.S. Patent and Trademark Office ("the PTO"), for a design patent on the Humvee, including the vertically slotted grille design. That design patent was never issued. In March 1983, the government selected AM General to manufacture the HMMWV.

During the government's testing of the Humvee prototypes, AM General engineers made various design modifications based on performance issues raised by the govern-

ment; in one of those changes, the engineers moved the headlamps inboard and eliminated the two outer slots of the nine-slotted grille. The Humvee's seven-slotted grille first appeared in a blueprint completed in November 1982. Since the government's 1983 acceptance of the final production version of the Humvee, every Humvee (apart from some 3,000 upper-armored vehicles) has employed the AM General engineers' front grille design consisting of seven vertical slots. AM General sent production versions of the Humvee to the military in 1984 for more testing but didn't begin shipping Humvees to the military until March 1985.

American Motors sold its AM General stock and assets to LTV Corporation on July 24, 1983.

The Humvee was featured quite favorably in 1990 news coverage of Operation Desert Shield during the months in which forces gathered in the Persian Gulf for what became Operation Desert Storm. Building on that renown as a Desert Storm "hero," AM General launched a commercial vehicle then called the "Hummer" (now called the "H1") in 1992. The H1 was (and continues to be) equipped with literally the same hood as the Humvee, with the same vertically slotted grille design.

AM General adopted its "Hummer icon"— a silhouette of an approaching H1—in 1992. The logo displays in black the vertical, bisected windshield, the side mirrors, the tires and undercarriage/suspension, while highlighting the headlights, the front grille's seven vertical openings, the upper (hood) grille, and a series of three circles below the bumper that were not identified at the hearing. The icon appeared on promotional items accompanying the national launch of the H1 in 1992, and has appeared since on all subsequent Hummer dealer signs, company stationery, and business cards. AM General adopted the icon as its official company logo in 1993. Since 1994, several items of Hummer merchandise included in a catalog ("Hummer Stuff") features

the icon on such items as mugs, golf balls, key chains, posters, T-shirts, caps, toys, sew-on patches, and a tie tack/lapel pin that shows only the H1 front end, including the grille.

In 1993, AM General applied for a U.S. trademark registration for the appearance of the front end of the Humvee, which includes the headlight sockets, running light openings, grille, and bumper. The application sought registration for trucks, and not just military trucks or high-end sport utility vehicles. The examiner denied the application on three grounds: it was not inherently distinctive (was not a source identifier for consumers); it was merely ornamental rather than a source identifier; and it was likely to be confused with another registration—the first of the three registrations for the Jeep Wrangler grille/headlight configuration. AM General twice sought reconsideration, with the second effort producing approval and publication.

DaimlerChrysler monitored that application's progress; AM General sent DaimlerChrysler a request for a consent AM General hoped to file in conjunction with its application. DaimlerChrysler twice obtained extensions of time for response, but ultimately filed no response. DaimlerChrysler did not tell the PTO that the Hummer grille was the Jeep grille, or that AM General was only a licensee of the mark rather than the owner (an issue discussed later in this opinion). In March 1996, the U.S. government issued AM General an unrestricted registration of the design for use on "trucks." DaimlerChrysler asserted no right to the registered grille until late 1999. Every AM General sales brochure for the H1 featured the Hummer grille; some included the language: "Hummer, Humvee and the Hummer vehicles' grille designs are registered trademarks of AM General Corporation."

Since the launch of the H1, AM General's Hummer brochures and ads have used slogans like "Meet an American Legend" and "The Legend Grows." DaimlerChrysler con-

tends that the use of "Legend" lines is taken directly from Jeep advertising; AM General says it used "Legend" slogans to evoke the H1's own military heritage. General Motors's H2 promotional materials and advertisements similarly feature the vehicle's front end (including the grille) and make references to the "Legend."

Many photographs that have appeared in the print media over the last ten years have viewed the Humvee or H1 from the front, which draws attention to the grille. AM General paid for some of those promotions, but most appeared without expense to AM General. Some of those photos of approaching Humvees and/or H1s are found in ads by other firms, such as Panasonic and Mastercard that obtained AM General's permission to use the vehicles in attempts to associate their products and services with the Hummer brand. These advertisements and photographs have appeared in national publications such as the *Wall Street Journal* and *USA Today*. AM General also licensed companies to use images of the Humvee (in which the grille is featured prominently) to sell their own merchandise. DaimlerChrysler never challenged AM General's use of the grille design on the Humvee, and until this litigation, DaimlerChrysler had never objected to or challenged AM General's grille design on the H1.

While the H1 was gaining recognizability (though not sales—at more than $100,000.00, AM General never sold more than 900 H1s in a year), General Motors was exploring the possibility of developing a very rugged four-wheel drive SUV—code-named "The Chunk"—under an existing General Motors brand. Market research was promising, but faced with the need to spend hundreds of millions of dollars to launch such a new vehicle, General Motors decided to look into the Hummer, which (according to General Motors's research) had a highly favorable image and was well-known to the potential purchasers of such an SUV—qualities that would be difficult to build from scratch for an

entirely new model. Negotiations ensued, and in June 1999, AM General and General Motors announced their intentions to enter into a contract that would transfer the Hummer brand to General Motors and pursue new product opportunities for the Hummer brand. Within days after that press release, DaimlerChrysler was consulting its lawyers concerning "legal issues in Hummer dispute" and "Hummer litigation." Despite those discussions, DaimlerChrysler said nothing to General Motors.

On December 21, 1999, General Motors and AM General entered into a series of agreements to transfer to General Motors the Hummer brand and all intellectual property rights embodied in the Hummer vehicle. General Motors granted AM General exclusive production rights for the first new model of Hummer vehicle; AM General agreed to construct a brand new facility for that purpose; General Motors gave AM General the continued right to use the Hummer grille design on the Humvee.

The December 1999 General Motors-AM General agreements contemplated a joint effort to manufacture, market, and distribute the Hummer and new Hummer models, the first of which was the H2. The H2 was to be about the same size as the very large original H1 (a bit taller, a bit narrower), but would include luxury features not available on the H1. The H2 was to retain the H1's visual brand identity and character, in the hopes of endowing it with the broad recognition and favorable identity General Motors's consumer research found in the H1. That research found the H1's front end, including the grille, to be one of several visual cues important to consumers; accordingly, the grille General Motors intends to use on the H2 is a narrower version of the grille used on the H1 and the Humvee before it, with the configuration of vertical slots that appear in the Hummer front end registration.

On December 22, 1999, the day after the transaction closed, a DaimlerChrysler attorney notified General Motors

of DaimlerChrysler's objection to the manufacture and sale of any new vehicle bearing the H1's grille design.

General Motors unveiled an H2 concept vehicle at the January 2000 Detroit auto show and featured that concept vehicle on its Hummer web site until replacing it with pictures of the proposed H2 production vehicle, which brought no change in the grille design. Since January 1990, General Motors has promoted the H2 vehicle extensively. The H2 has appeared in auto shows, the Hummer web site, in press coverage on television, in auto enthusiast magazines, and in newspapers.

The H2 is comparable in size to the H1 in all but width and is considerably larger than any Jeep vehicle available in the United States. The word "H-U-——E-R" appears on the grille,[4] the rear bumper, and on each of the four wheels. "H2" appears on the left and right front doors. The H2's base price at launch is expected to be at least $47,900.00; options, dealer charges, and taxes will take the average consumer transaction over $50,000.00.

Vertically slotted grills have appeared occasionally on other SUVs down through the years. The current model of the Lexus RX-300 (introduced in 2001) has ten bars that appear to create ten slots, but the slots don't appear to have been stamped through a planar surface. The current model of the Kia Sportage (which was introduced in January 2002) has five slots. DaimlerChrysler sent letters to both Toyota (which makes the Lexus) and Kia warning that those grilles appeared to infringe upon the Jeep grille design. Both of those letters were dated January 31, 2002, five days before

---

[4] General Motors added that lettering after DaimlerChrysler complained about the grille's similarity to what DaimlerChrysler considers the Jeep grille design. The black letters on the chrome grille appear on the vertical sections that divide the slots. From any significant distance, the letters are not easily seen.

this preliminary injunction hearing was scheduled to begin.[5]

### D. THIRD PARTY CONCERNS

AM General already is producing fully assembled pilot H2s for distribution to dealers for sale to consumers; AM General is scheduled to be in full production by March 29. AM General has committed more than $30 million to hire and train the H2 plant's salaried and hourly work force. By the time of the hearing, AM General had hired about 470 of the 1,000 employees for the H2 plant, and was working toward the hiring of the others. Many of these people had quit their previous jobs to take employment at the H2 plant, and some have relocated or are in the process of relocating. AM General employees will complete a total of 170,000 training hours preparing for their jobs at the H2 plant. If the H2 plant is closed for any period of time, employees will lose money and suppliers will lose anticipated sales; those losses, of course, increase with the length of the shutdown.

In anticipation and aid of new jobs, the State of Indiana and St. Joseph County (in which the AM General plants are located) provided millions of dollars to AM General in tax abatements, tax credits, training grants, and road construction. St. Joseph County, with contribution from AM General, purchased and demolished some forty homes on what is now the H2 plant site and paid to relocate the residents. General Motors loaned AM General $235 million to design, build, and equip the H2 plant.

---

[5] It is unclear how DaimlerChrysler might define its trade dress in any dilution or infringement suit against Toyota or Kia; the definition advanced in this case would not seem to encompass the five-slotted Kia grille or the unstamped Lexus grille.

## E.  LIKELIHOOD OF SUCCESS: GENERALLY

DaimlerChrysler brings essentially two claims. First, it contends that General Motors's use of the planned H2 grille will dilute its mark in the "Jeep grille design." The Federal Trademark Dilution Act, 15 U.S.C. §§ 1125(c) & 1127, amended the Lanham Act to address the "lessening of the capacity of a famous mark to identify and distinguish goods or services," *Syndicate Sales, Inc. v. Hampshire Paper Corp.*, 192 F.3d at 639 (quoting 15 U.S.C. § 1127), and to "protect[ ] the trademark owner from the erosion of the distinctiveness and prestige of a trademark," *Eli Lilly & Co. v. Natural Answers, Inc.*, 233 F.3d at 466 (internal quotation marks omitted).

To succeed on the merits of its dilution claim, Daimler-Chrysler must prove each of the following: (1) that the mark is famous; (2) that General Motors adopted the mark after the mark became famous; (3) the infringer diluted the mark; and (4) the defendant's use is commercial and in commerce. 15 U.S.C. § 1125(c)(1); *Syndicate Sales*, 192 F.3d at 639. The Act protects non-functional product configuration against dilution to the same extent as any other trademark. *See, e.g.*, *Thomas & Betts Corp. v. Panduit Corp.*, 138 F.3d at 297; *Computer Care v. Service Sys. Enters., Inc.*, 982 F.2d 1063 (7th Cir. 1992). Dilution differs from trademark infringement; it does not require a showing of consumer confusion as to source. *See* 15 U.S.C. § 1127.

15 U.S.C. § 1125(c)(1) sets forth a non-exhaustive list of factors to be considered in deciding whether a mark is distinctive and famous:

> (A) the degree of inherent or acquired distinctiveness of the mark; (B) the duration and extent of use of the mark in connection with the goods and services with which the mark is used; (C) the duration and extent of advertising and publicity of the mark; (D) the geographical extent of the trading area in which the mark is

used; (E) the channels of trade for the goods or services with which the mark is used; (F) the degree of recognition of the mark in the trading areas and channels of trade of the mark's owner and the person against whom the injunction is sought; (G) the nature and extent of use of the same or similar marks by third parties; and (H) whether the mark is federally registered . . . .

If the junior mark would weaken—"blur"—the senior mark's "ability to serve as a unique identifier of the plaintiff's product," it is likely to dilute. *Eli Lilly & Co. v. Natural Answers, Inc.*, 233 F.3d at 466. A likelihood of dilution is proven by reference to the marks' similarity and the senior mark's strength. *Eli Lilly v. Natural Answers*, 233 F.3d at 468.

DaimlerChrysler's second claim is that the H2 grille infringes its trademark. To prevail on the merits of this claim, DaimlerChrysler will have to prove both that the Jeep grille design is distinctive, and that the grille on the H2 is likely to cause consumers to believe mistakenly that the H2 is manufactured, sponsored, or endorsed by, or affiliated or connected with, the Jeep brand. *Johnny Blastoff, Inc. v. Los Angeles Rams Football Co.*, 188 F.3d at 436.

In determining likelihood of confusion, the court looks to: (a) the similarity of the trademarks or trade dresses; (b) the area and manner of concurrent use (including the similarity of the products on which the trademarks or trade dresses are being used); (c) the degree of care likely to be used by consumers; (d) the strength of the plaintiff's trade dress; (e) actual confusion; and (f) whether the defendant intended to pass off its product as that of the plaintiff. *Thomas & Betts Corp. v. Panduit Corp.*, 138 F.3d at 296.

## F. FAMILY OF MARKS

DaimlerChrysler relies on what it calls the "Jeep grille design," which John Sgalia (DaimlerChrysler's lead Jeep

designer) defines as seven to ten vertical slots that appear to be stamped through a planar surface. DaimlerChrysler has not used the "Jeep grille design" on all its products, and Mr. Sgalia's definition does not appear in DaimlerChrysler documents (until Mr. Sgalia formulated the definition the day before his deposition), but the family's definition need not be written and need not be used on all products. *Motorola, Inc. v. Griffiths Electronics, Inc.*, 317 F.2d 397, 400-01 (C.C.P.A. 1963). DaimlerChrysler contends that the history of Jeep vehicles includes a family of marks that share those elements.

DaimlerChrysler's pre-discovery brief in support of its preliminary injunction request spoke of a "Jeep grille design," but its post-discovery brief refers to a family of marks. DaimlerChrysler takes this position because it has used a variety of grilles that fit within its definition of the Jeep grille design, and many of those grilles are quite dissimilar in appearance.

DaimlerChrysler's counterclaim alleges that the intended H2 grille—which consists of seven vertical slots that appear to be stamped into a planar surface—will dilute its asserted family of marks comprising the "Jeep grille design," and will infringe that family of marks by confusing consumers into a mistaken belief that Jeep manufactures, sponsors, or is associated with the H2. DaimlerChrysler's preliminary injunction motion asks the court to enjoin General Motors from proceeding with the manufacture, marketing, and sale of the H2 with its intended grille.

While the Humvee and the H1 literally use the same grille, the H2 grille will be essentially the same, except that it will be presented in chrome rather than in the plastic comprising the front of the vehicle. Accordingly, DaimlerChrysler must show that its family of marks existed at the time of the first commercial use of the intended H2 grille. General Motors argues that the first such use was in

1981, when AM General supplied a prototype Humvee to the U.S. government, but the prototype had a nine-slotted grill. The first commercial use of the grille used consistently from the Humvee through its two commercial successors was 1985, when AM General delivered the first Humvee to the government under its contract. To succeed on the merits of its dilution claim, then, DaimlerChrysler must show the existence of its claimed family of marks by or before 1985, *Marion Laboratories, Inc. v. Biochemical/Diagnostics, Inc.*, 6 U.S.P.Q.2d 1215 (T.T.A.B. 1988); *In re Globe-Union, Inc.*, 189 U.S.P.Q. 158 (T.T.A.B. 1975), though not all members of the alleged family need have existed at that point. *McDonald's Corp. v. McKinley*, 13 U.S.P.Q.2d 1895, 1899 (T.T.A.B. 1989).

DaimlerChrysler contends that since 1945, it has sold an unbroken lineage of Jeep vehicles that featured a consistent grille design with easily recognizable common characteristics: seven to ten (and in recent years, exclusively seven) vertical slots that appear to be stamped through a planar surface. The stamped-through appearance produces an image of holes perforated within a surrounding frame. The grille designs used on Jeep vehicles have conveyed a consistent overall visual impression to consumers, DaimlerChrysler says, and so have come to be recognized as a singular symbol—what DaimlerChrysler calls the Jeep grille design.

A point of clarification is needed before proceeding further. Professor McCarthy tells us that, "While trade dress is most often defined as a totality of elements, there is no reason why the plaintiff cannot define a list of elements consisting of less than the totality of features appearing on a package or container." 1 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 8:1 (4th ed. 2001). Stated differently, "the plaintiff in a trade dress action under section 43(a) of the Lanham Act is free to seek trade dress protection for whatever products or packaging it sees

fit." *Rose Art Indus., Inc. v. Swanson*, 235 F.3d 165, 170, 173 (3d Cir. 2000). DaimlerChrysler excludes the headlamp openings from its definition of the Jeep grille design family of marks; the definition includes only the number and appearance of slots. Few of the exhibits introduced into evidence at the hearing, though, depict Jeep grilles or Hummer grilles without (at least) the headlamp openings. DaimlerChrysler's trademark registrations for Wrangler grilles depict the headlamp openings; the Jeep insignias for Camp Jeep and the Jeep ties include the headlamp openings (and the same is true for the AM General logo and items in the "Hummer Stuff" catalog); General Motors's registered trademark addresses the entire front end. All surveys included headlamp openings.

### 1. FAMILY OF MARKS: THE LAW

A "family of marks" is

> a group of marks having a recognizable common characteristic, wherein the marks are composed and used in such a way that the public associates not only the individual marks, but the common characteristic of the family, with the trademark owner. Simply using a series of similar marks does not of itself establish the existence of a family. There must be a recognition among the purchasing public that the common characteristic is indicative of a common origin of the goods.

*McDonald's Corp. v. Druck & Gerner, DDS., P.C.*, 814 F. Supp. 1127, 1131 (N.D.N.Y. 1993), *quoting J & J Snack Foods Corp. v. McDonald's Corporation*, 932 F.2d 1460, 1462 (Fed. Cir. 1991).

A family of marks exists only if and when "the purchasing public recognizes that the common characteristic is indicative of a common origin of the goods." *Han Beauty, Inc. v. Alberto-Culver Co.*, 236 F.3d 1333, 1336 (Fed. Cir. 2001);

*accord*, *Cambridge Filter Corp. v. Servodyne Corp.*, 189 U.S.P.Q. 99 (T.T.A.B. 1975).

DaimlerChrysler claims a family comprised of trade dress. "Trade dress" is the "total image or overall appearance of a product," including size, shape, color, texture, and graphics. *Rose Art Indus., Inc. v. Swanson*, 235 F.3d 165, 171 (3d Cir. 2000); *Badger Meter, Inc. v. Grinnell Corp.*, 13 F.3d 1145, 1151 (7th Cir. 1994); *Kohler Co. v. Moen, Inc.*, 12 F.3d 632, 641 n.11 (7th Cir. 1993). When considering a claimed family of trade dress, courts apply a "consistent overall look" standard:

> We agree with the District Court that "if a plaintiff seeking trade dress protection cannot show that its packages have a 'consistent overall look,' the trade dress that the defendant is allegedly infringing 'does not exist,'" and the defendant must prevail. . . .
>
> In endorsing the "consistent overall look" standard, however, we do not require that the appearance of the series or line of products or packaging be identical. . . . Certainly the fact that Rose Art packages the same product in several different types of packaging does not prevent Rose Art from seeking trade dress protection for one of these packaging designs. . . .
>
> Even if Rose Art distributed the same products, for example, generic crayons, markers, and colored pencils in fifteen different package designs for each of fifteen different customers, this fact alone would not prevent Rose Art from obtaining trade dress protection for one of the fifteen different packaging styles. One or more of the package designs could be recognizable trade dress as long as it had a "consistent overall look." . . .
>
> We conclude that when applying the "consistent overall look" standard, that is, when determining whether the trade dress alleged by the plaintiff is recognizable, protectable trade dress, a trial court should consider

> only the products or packaging for which the plaintiff is seeking trade dress protection.

*Rose Art Indus. v. Swanson*, 235 F.3d at 172-75. One claiming family trade dress protection must articulate a specific trade dress and demonstrate that it has consistently used that trade dress, and even then, "courts consider these broader product line claims with an 'acute' concern for protecting competition given that any remedy could potentially cover a wide range of products." *Regal Jewelry Co., Inc. v. Kingsbride Int'l, Inc.*, 999 F. Supp. 477, 486 (S.D.N.Y. 1998) (citations omitted) ("Ultimately, Regal's Lanham Act claim fails because it has not consistently defined the elements of, or pursued the use of, a theme trade dress.").[6]

To be protected, the common characteristic must have developed secondary meaning. *Spraying Systems Co. v. Delavan, Inc.*, 975 F.2d 387, 393 (7th Cir. 1992); *see also Traffix Devices, Inc. v. Marketing Displays, Inc.*, 121 S. Ct.

---

[6] Unless the trade dress for which protection is sought is specifically defined with a stable visual appearance, the party seeking protection might obtain a right to monopolize a variety of dress far beyond what the plaintiff might ever use. *Landscape Forms, Inc. v. Columbia Cascade Co.*, 113 F.3d 373, 380 (2d Cir. 1997) ("focus on the overall look of a product does not permit a plaintiff to dispense with an articulation of the specific elements which comprise its distinct dress. Without such a precise expression of the character and scope of the claimed trade dress, litigation will be difficult, as courts will be unable to evaluate how unique and unexpected the design elements are in the relevant market."); *Keystone Camera Prods. Corp. v. Ansco Photo-Optical Prods. Corp.*, 667 F. Supp. 1221, 1228-30 (N.D. Ill. 1987).

The court is concerned about whether a definition that includes "seven to ten" vertical slots is sufficiently specific, but since that issue was not addressed at the preliminary injunction hearing, the court pursues it no further.

1255, 1259 (2001) ("The design or packaging of a product may acquire a distinctiveness which serves to identify the product with its manufacturer or source; and a design or package which acquires this secondary meaning, assuming other requisites are met, is a trade dress which may not be used in a manner likely to cause confusion as to the origin, sponsorship, or approval of the goods."). In other words, the family characteristic must be such as to inform the consumer of the product's source, not simply of its nature, *Ft. Howard Paper Co. v. Nice-Pek Prods., Inc.*, 127 U.S.P.Q. 431 (T.T.A.B. 1960) ("-NAP" suffixes told public that products were used in connection with napkins, not that they came from the same source), so as to prompt the consumer who sees an article of merchandise to say, "That's the article I want because I know its source," not "Who makes that article?" *Ferrari S.P.A. v. Roberts*, 944 F.2d 1235, 1239 (6th Cir. 1991), *citing West Point Mfg. Co. v. Detroit Stamping Co.*, 222 F.2d 581, 595 (6th Cir. 1955).

Whether a family of marks exists is an issue of fact based on the common formative component's distinctiveness, the family's use, advertising, promotion, and inclusion in party's other marks. *McDonald's Corp. v. McBagel's, Inc.*, 649 F. Supp. 1268, 1271 (S.D.N.Y. 1986). Whether the party claiming a family of marks has used joint advertising and promotion in a manner designed to create an association of common origin may be pertinent. *Champion Int'l Corp. v. Plex-owood, Inc.*, 191 U.S.P.Q. 160 (T.T.A.B. 1976).

Likelihood of confusion may be a significant component in determining whether a family of marks exists. *Norwich Pharmacal Co. v. Salsbury Labs.*, 168 U.S.P.Q. 250 (T.T.A.B. 1970) ("In view of opposer's sole theory for relief, this narrows the issue to whether or not opposer possesses a 'family' of marks in the veterinary pharmaceutical field characterized and recognized in the trade and by purchasers of opposer's products by the inclusion in each mark of the syllable 'FUR'; and, if so, whether or not applicant's

'SALFURIDE' mark will be mistakenly considered to be another member of the 'family' . . . . The key to the question before us is whether or not the average purchaser of veterinary medicinal preparations does, in fact, or would believe that all nitrofuran containing pharmaceutical preparations sold under trademarks with the syllable 'FUR' originate exclusive with opposer."); *In re Mobay Chem. Co.*, 166 U.S.P.Q. 218 (T.T.A.B. 1970); *Servo Corp. of America v. Servo-Tek Prods. Co.*, 289 F.2d 955, 956 (C.C.P.A. 1961) (" 'there is no such resemblance between applicant's mark 'Servospeed' and any of opposer's marks as would be likely to cause confusion or mistake or deception of purchasers.' "). A concern of "family" jurisprudence is whether a competitor may position its product or service in such a position as to confuse the public as to its origin. For example, in *Duffy-Mott Co. v. Borden, Inc.*, 201 U.S.P.Q 846 (T.T.A.B. 1978), the court explained:

> we have here a situation where opposer has built a successful business of selling a closely related group of products under a series of similar marks having a common characteristic, whose rights in its group of marks have, on the record, been respected by the fruit beverage and vegetable beverage industry, and next to which applicant seeks to juxtapose itself (while having knowledge of opposer's marks and goods) with a closely related product being offered under a mark that shows not the slightest ingenuity in being distinguished from opposer's marks.

A family of products in a particular field does not necessarily connote a family of marks. *Norwich Pharmacal Co. v. Salsbury Labs.*, 168 U.S.P.Q. 250 (T.T.A.B. 1970). Merely adopting and using—and even registering—a group of marks with a common feature does not create a family of marks, even if the user intended to create a family. *American Standard, Inc. v. Scott & Fetzer Co.*, 200 U.S.P.Q. 457, 461 (T.T.A.B. 1978); *Consolidated Foods Corp. v. Sherwood*

*Med. Indus., Inc.*, 177 U.S.P.Q. 279 (T.T.A.B. 1973); *Polaroid Corp. v. Richard Mfg. Co.*, 341 F.2d 150 (C.C.P.A. 1965). Use of the common formative component in only a few products weighs against a finding of a family. *Creamette Co. v. Merlino*, 299 F.2d 55, 58-59 (9th Cir. 1962); *compare Motorola, Inc. v. Griffiths Electronics, Inc.*, 317 F.2d 397, 400-01 (C.C.P.A. 1963) ("if opposer has a family of six marks all starting with the non-descriptive word 'Golden,' it still has that family notwithstanding there may be some others using the same word to some undisclosed extent.").

## 2. FAMILY OF MARKS AND DILUTION: GRILLES ON JEEPS

When World War II ended, Willys-Overland registered "Jeep" as a trademark, and designer Barney Roos developed the Jeep CJ-2A for the civilian market. The first Jeep CJ-2A rolled out in August 1945 and sold for $1,090.00. The front of the CJ-2A bore a grille consisting of seven long narrow slots; two large, round headlamps were located just outside the top half of the grille, with two signal lights located immediately below the headlamps. The overall shape was akin to a laterally elongated oval atop a rectangle of the same height. The design is set forth in trademark registration 1,170,088, issued to DaimlerChrysler in 1981, which reports a first use in 1941. For purposes of these findings, the court refers to the configuration shown in that registration as "the CJ-2A grille."[7]

---

[7] During one examination in the preliminary injunction hearing, the questioner steadfastly referred to "the Hummer grille," which the witness, with equal determination, repeatedly called "the Jeep grille." To avoid a premature taking of sides in that dispute, the court gave brief consideration to referring to the CJ-2A configuration as "the Ford grille," since according to DaimlerChrysler Exhibit 200, Ford Motor Company contributed the vertical slotted grille to the military Jeep design.

DaimlerChrysler produced the Jeep CJ-2A until 1949. The CJ-3A was added to the Jeep line in 1948, and was produced until 1953. The longer-lived Jeep CJ-3B joined the line in 1952 and was produced until 1968. The Jeep CJ-5 appeared in 1954 and was produced until 1983. The Jeep CJ-6 was part of the Jeep line from 1955 to 1981. The Jeep CJ-5A (and, according to DaimlerChrysler Exhibit 190, the Jeep CJ-6A) was produced from 1964 to 1967. The Jeepster Commando was produced from 1966 to 1971, with the Hurst model produced in 1970. A truck (in the traditional cab-and-trailer sense, rather than the SUV sense) called the Jeep FC-150 and the Jeep FC-170 was produced from 1957 to 1964. A panel truck, the Jeep FleetVan FJ-3A, was produced from 1961 to 1964. The Jeep CJ-7 was produced from 1976 to 1986, with the Jeep CJ-8 (a pickup truck) produced from 1981 to 1986. The Jeep Wrangler replaced the CJ line in 1985 and continues to be produced to 2002, with a significant model change having been made in 1997.

Each of the Jeep models mentioned in the preceding paragraph—the CJ-3A, the CJ-3B, the CJ-5, the CJ-5A, the CJ-6, the CJ-6A, the CJ-7, the CJ-8, the Jeepster Commando, the Hurst Jeepster Commando, the FC-150, the FC-170, and the Wrangler models—bore the CJ-2A grille or something very close to it.

DaimlerChrysler also made Jeeps with slotted grilles that differed from the CJ-2A grille. For example:

- From 1984 to 1987, the Jeep Cherokee sported a grille with ten slots; the ten slots were the same height as the stacked headlamp openings, giving the overall design (grille and lights) a rectangular appearance.

- From 1988 to 1996, the Cherokee grille had eight slots; the overall design still consisted of a rectangular look with wider slots than before.

• From 1985 to 1987, the Jeep Comanche (a pickup truck) bore ten slots in a configuration that appears to have been identical to the 1984-1987 Cherokee.

• From 1988 to 1992, the Comanche had eight slots in a configuration that appears to have been identical to the 1988-1996 Cherokee.

DaimlerChrysler also was making other Jeeps with grilles that don't fit within its definition of the family of Jeep grille designs. Some had no slots:

• the 1972-73 Jeepster Commando grille consisted of vertical and horizontal bars describing a grid;

• the 1972-73 Wagoneer grille had two dominant horizontal bars and fourteen subordinate vertical bars;

• the 1974-1978 Wagoneer grille had two dominant horizontal bars, one subordinate horizontal bar, twelve vertical bars, and the grille enclosed the headlamp openings;

• the 1979-80 Cherokee grille appears to have consisted of a single horizontal bar running from one headlamp to the other, and that bar appears to have been removed on the 1979-80 Cherokee;

• from 1979 to 1985, the Wagoneer grille consisted of a narrow rectangular shape enclosing a grid pattern of bars and the headlamp openings.

Other Jeeps had vertical slots in high volume—a 1972-73 Jeep truck had twenty-two slots, as did the 1974-78 Cherokee and the remodeled 1974-78 Jeep truck, while another 1984-85 Wagoneer model sported twenty-one slots.

A 1971 Jeep advertisement (General Motors Exhibit 308) shows four Jeep models side-by-side. The two in the middle (the Commando and the Wagoneer) do not have slotted grilles. The two outside models have vertically slotted

grilles—the "Jeep"[8] that bears the CJ-2A grille, and the "Jeep Truck" with twenty-two slots.

A 1985 advertisement for Jeep and Renault vehicles (General Motors Exhibit 309A) carries eight photos of different models, not all of which were identified at trial. Four of the eight photos depict grilles; three of those are Jeep models. One of those photos shows a grille with predominant horizontal bars; another of those photos shows a grille with twenty-one vertical slots; the third of the photos shows the CJ-2A grille.

By 1985, when General Motors actually sold the first Humvees with seven vertical grille slots to the military, DaimlerChrysler had no family of grilles with seven to ten slots that appeared to have been stamped through a planar surface. The CJ-2A grille, which had been in use for forty years, was the Jeep mark—and it was registered as such. By 1985, only two other grilles fitting within the "family" specifications ever had been employed on Jeep models: a ten-slotted grille used on both the 1984-1985 Jeep Cherokee and the 1985 Jeep Comanche truck. There is no evidence that the ten-slotted grille (with vertical slots producing a very different configuration than the CJ-2A) had achieved secondary meaning by 1985, either alone or in conjunction with the CJ-2A grille. The only evidence bearing on the matter of secondary meaning is that DaimlerChrysler abandoned the ten-slotted grille by 1988, never to use it again.

As noted earlier, DaimlerChrysler's dilution claim requires proof that the family of marks was famous before General Motors adopted the allegedly diluting mark. Such a showing, of course, requires DaimlerChrysler to prove that its family of marks existed before General Motors adopted the allegedly diluting mark—a non-existent family

---

[8] Though identified in the advertisement simply as "Jeep," the model appears to be a Jeep CJ-6.

cannot be famous. DaimlerChrysler has not shown that it has a better than negligible likelihood of making such a showing at trial, so it is not entitled to a preliminary injunction on the dilution claim.

### 3. FAMILY OF MARKS AND INFRINGEMENT

DaimlerChrysler's infringement claim might require consideration of a different point in time. DaimlerChrysler presented evidence concerning the strength of the family of marks that exists in 2002, when all three Jeep models bear grilles with seven vertical slots that appear to have been stamped through a planar surface.[9] Courts are not in full agreement as to whether the strength of the allegedly infringed mark should be examined as of when the allegedly infringing mark entered the marketplace or as of the date the injunction is sought, but the weight of authority sensibly favors the proposition that "the proponent of a family of marks must prove that, prior to the junior user's entry, all or many of the marks in the alleged family were used and promoted in such a way as to create public perception of the family mark as an indicator of source." *Simon & Shuster Inc. v. Dove Audio, Inc.*, 970 F. Supp. 279, 297 (S.D.N.Y. 1997), *citing Marion Labs. Inc. v. Biomedical/ Diagnostics, Inc.*, 6 U.S.P.Q.2d 1215 (T.T.A.B. 1988) (declining Simon & Shuster's invitation to look at the strength of its family of marks in the present); *see also Pfizer v. Astra Pharm. Prods. Inc.*, 858 F. Supp. 1305, 1329 (S.D.N.Y. 1994) (holding that "the existence of the family of marks should be judged at the time that the junior user entered the marketplace"); *see also Talk To Me Prods., Inc. v. Larami Corp.*, 804 F. Supp. 555, 563 (S.D.N.Y. 1992) (holding that secondary meaning doesn't prohibit a junior use of the mark

---

[9]  Since 1998, but not before, all Jeep models have had grilles that fit within's DaimlerChrysler's definition of its "family."

if the junior use came into the marketplace before the senior mark acquired its secondary meaning); *but see McDonald's Corp. v. Druck and Gerner*, 814 F. Supp. 1127, 1133 (N.D.N.Y. 1993) (measuring the strength of the mark from the present standpoint).

The court agrees with the reasoning of the majority: General Motors can't be said to have infringed a family of marks that did not exist when its grille entered the market, or at least had not acquired secondary meaning when the General Motors grille entered the market. If DaimlerChrysler marketed only one member of the "family" when General Motors entered the market, there was no family even if DaimlerChrysler intended to add other products to the family. *Pfizer, Inc. v. Astra Pharm. Prods.*, 858 F. Supp. 1305, 1329 (S.D.N.Y. 1994). The court considers the strength of any family of marks from the time the offending grille entered the marketplace. As just set forth, the Hummer grille entered the marketplace in 1985, and while the CJ-2A grille had secondary meaning in 1985, no family of marks had been established from which consumers identified source.

## 4. THE LICENSING ISSUE

DaimlerChrysler presents a second ground for not looking to 1985. DaimlerChrysler contends that AM General had no right to convey (and so General Motors did not obtain) any right to use the Humvee's grille design because in 1983, AM General received from Jeep a limited license to use the Jeep grille design only on its military Humvees, and the license, DaimlerChrysler contends, precluded the use of the grille design on mainstream SUVs that compete directly with the Jeep brand. DaimlerChrysler maintains that when AM General was designing its Humvee prototype in the early 1980s, Jeep designers, at AM General's specific request, incorporated the Jeep grille design into the Humvee to

"reflect[ ] a Jeep-type appearance." When AM General got the Humvee contract, as DaimlerChrysler sees it, American Motors Corporation granted AM General a license to use the Jeep grille design on the Humvee, but for no other purpose.

The license issue relates to the agreements under which American Motors sold AM General to LTV. Section 2.07 of the stock purchase agreement stated: "Set forth on Schedule 2.07(c) is a list of each patent, trademark and patent or trademark application owned by [AM General]." The 1982 design patent application for the Humvee design was among the itemized rights transferred to LTV. That application never produced a patent, but the application showed a vertically slotted grille. The stock purchase agreement also contained a provision on proprietary rights (§ 5.09) that said American Motors would license unspecified rights (specifically excluding the American Motors and Jeep names and the transferred rights listed in Schedule 2.07(c)) to LTV before the stock purchase transaction closed in September 1983. American Motors and LTV entered into the contemplated license agreement in September 1983.

The stock purchase agreement reserved to American Motors "the 'American Motors' or 'Jeep' names and marks or the American Motors logo or any derivatives thereof." A side agreement, dated September 14, 1983, excluded specified intellectual property from transfer, including the CJ-10 vehicle design. The side agreement made no reference to the Humvee.

From the time of its sale to LTV, AM General has produced and—since 1985—sold the Humvee with a front grille design that consists of seven vertical slots. AM General has used the same grille on the Hummer since 1992. In 1996, AM General received trademark registration (the application had been submitted in 1993) for the Humvee/H1 front end, including the grille, and AM General has licensed the

Humvee/H1 grille design to a variety of businesses for their own commercial use.

DaimlerChrysler says these agreements licensed AM General to use the grille configuration, but to do so only on the Humvee, which was only for military use. AM General says the agreements reserved to American Motors no ownership interest in the Humvee's grille configuration. New York law controls the 1993 agreements pursuant to § 7.10 of the stock purchase agreement. When faced with conflicting interpretations of a clause, New York law directs the court to interpret the clause so as to give reasonable and effective meaning to all terms and produce no meaningless clause. *Galli v. Metz*, 973 F.2d 145, 149 (2d Cir. 1992). The court "must consider the entire contract and choose the interpretation . . . 'which best accords with the sense of the remainder of the contract.'" *Id.*, *quoting Rentways Inc. v. O'Neill Milk & Cream Co.*, 126 N.E.2d 271, 275 (N.Y. 1955).

Section 5.09 of the stock purchase agreement and the ensuing license agreement addressed, without mention of the Humvee, proprietary rights American Motors licensed to AM General. The Humvee was addressed in § 2.07 of the stock purchase agreement, which stated that all intellectual property owned by AM General was listed on Schedule 2.07(c). That list included the 1982 trademark registration for the Humvee name in International Class 12 (Trucks), and the 1982 design patent application for the Humvee military vehicle. The Humvee was not mentioned anywhere else in the 1983 agreements.

To agree with DaimlerChrysler, the court would have to find that American Motors conveyed to AM General all rights in the then-pending design patent application for the Humvee—an application that disclosed a grille consisting of seven to ten vertical slots that appeared to have been stamped on a planar surface—while tacitly and simultaneously retaining and licensing the grille design. No law,

including New York law, requires a court to so contort contractual language. The agreements' plain and unambiguous language transferred to AM General all rights relating to the Humvee design. AM General could not call the Humvee a "Jeep" or equip it with the trademarked CJ-2 grille design (as registered, with the headlamps and running lights positioned)—those rights were reserved to American Motors and were not even licensed—but no other pertinent restrictions were placed on AM General's entitlement to the Humvee and its design.

DaimlerChrysler notes that AM General never received the design patent that it had applied for, but the application's outcome (even if properly a matter to consider in the face of unambiguous language) tells nothing of the parties' intent, and the fact of the application strongly supports General Motors. In September 1983, so far as the preliminary injunction record shows, there was no reason to believe that the design patent application would be denied; the sophisticated parties to these agreements would not have structured the transaction in such a way that AM General might receive patent protection over a design that included American Motors's intellectual property—especially if the design was seen as encompassing the CJ-2A grille design that had adorned Jeeps for nearly four decades.

DaimlerChrysler presented the testimony of John Tierney, who helped negotiate the 1983 agreements while employed by American Motors. Mr. Tierney testified to his belief that the Humvee had a Jeep grille design, and that American Motors licensed AM General to use the Jeep grille design on the Humvee. The court is unmoved for two strong reasons. First, since the agreements' language is unambiguous, it is improper to resort to parol evidence concerning the parties' intent. *Blue Jeans U.S.A., Inc. v. Bas Ciaro*, 729 N.Y.S.2d 703, 705 (N.Y. App. Div. 2001). Second, the court's task is to ascertain the parties' intent, not the intent of the

parties' negotiators. Whatever Mr. Tierney may have believed, and whatever the propriety of considering his testimony about his understanding, the agreements' plain and unambiguous language makes it clear that AM General was to receive all things Humvee, at least to the extent shown in the design patent application.[10]

Were the court to turn to parol evidence, the most persuasive evidence of American Motors's intent would not be Mr. Tierney's testimony, but rather the complete inattention that American Motors and its successors paid to the purported license. Through the 1990s, the front end of the Humvee gained considerable renown—"fame" in the everyday sense—in news reports, entertainment, toys, and advertising. The purported licensors did nothing whatsoever to attend to such uses or collect royalties from AM General or its successors, or from those who used the image of the Humvee, and (as is discussed later) did not object when AM General sought trademark registration for the front end of the H1, including the grille. This uninterrupted inattention to the "license" speaks deafeningly to American Motors's intent in entering into the 1983 agreements with LTV.

AM General had no license with respect to the grille on the front end of the Humvee.

---

[10] Both sides presented several party-opponent statements found in internal memoranda. Such statements were properly offered and admitted as admissions under Fed. R. Evid. 801(d)(2)(D), but the court does not believe that any of them disclose any corporate position taken by DaimlerChrysler or General Motors. The court considers those statements simply as proof that someone within the company had a particular thought and conveyed it to others in the company.

## G.  THE CJ-2A GRILLE: DILUTION AND LACHES

That DaimlerChrysler had no family of marks—no family of Jeep grille designs—in 1985 does not mean that DaimlerChrysler had nothing entitled to trademark protection. *See Champion Int'l Corp. v. Plex-owood, Inc.*, 191 U.S.P.Q. 160 (T.T.A.B. 1976). DaimlerChrysler had the CJ-2A grille design, which can be assumed both to have been famous and to have had secondary meaning in 1985 by virtue of its long history of consistent use on Jeeps in the marketplace. Although DaimlerChrysler's counterclaims make reference to its registered trademarks for the CJ-2A design and similar designs it has used on the Wrangler, DaimlerChrysler has expressly excluded the headlamp openings from the mark it seeks to protect through this requested injunction, and each of the registered Jeep trademarks include the headlamp openings.

DaimlerChrysler has not shown a better than negligible likelihood of success on a claim that the intended H2 grille presents a likelihood of dilution of the mark consisting of the CJ-2A grille design because DaimlerChrysler has demonstrated no chance of overcoming General Motors's affirmative defense of laches. "The application of laches in a particular case is dependent upon a showing of an unreasonable lack of diligence by the party against whom the defense is asserted and prejudice arising from this lack of diligence." *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 822 (7th Cir. 1999). General Motors points to DaimlerChrysler's failure to challenge the use of the vertically slotted grille on the Humvee in 1985 or thereafter, and the failure to challenge the same vertically slotted grille on the H1 in 1993 or thereafter. If DaimlerChrysler had not remained silent as the grille was used on the Humvee and the H1, General Motors says, it would not have invested millions of dollars into the acquisition of the Hummer brand and development of the H2.

DaimlerChrysler responds with several arguments. First, DaimlerChrysler says that any lack of diligence belongs on General Motors's doorstep: had General Motors diligently investigated AM General before acquiring the Hummer brand and funding a new plant, General Motors would have learned that AM General owned no rights to the grille design used in Humvee and the H1, but rather was only a licensee entitled to use the design only on military vehicles. That argument requires no further discussion, since the court already has found that AM General acquired from American Motors full rights to the Humvee design, including the vertically slotted grill, and that no license existed.

DaimlerChrysler also notes that during the trademark registration process, AM General sought DaimlerChrysler's consent after the PTO had noted, as a ground for denial, DaimlerChrysler's first registration of the CJ-2A grille. AM General sent DaimlerChrysler a proposed form of consent that included language to the effect that the Humvee did not compete in the same market as any Jeep product.[11] That language, DaimlerChrysler says, implicitly disclaimed any intention of future competition with Jeep models, and so justifies its failure to object to the Hummer's commercial use of the grille design.

The court does not agree that a letter to which no reply ever was made can be thought to have such significance as DaimlerChrysler attributes to this one. Nothing in the classification of vehicles for which the registration was sought would prevent the mark's use in the SUV market; if

---

[11] The consent form stated, "[T]he primary market for the 'HUM-MER' vehicle is the military, with a civilian version having been introduced in recent years, but with great commonality to the military version of the vehicle. The 'JEEP' vehicle radiator grille design appears in the sport/utility vehicle segment, and these vehicles are typically priced one-half to one-third the price of the 'HUMMER' vehicle."

DaimlerChrysler wanted an implicit non-compete pledge to be part of the registration, the better course of action would seem to have been to communicate its concern to the PTO, perhaps by executing the consent form that contained what DaimlerChrysler now claims to have read as a promise.[12] In any event, DaimlerChrysler's argument addresses why it was silent after the November 1994 letter, and provides no explanation for the lack of objection from 1985 until then—including the years after 1992, when AM General was selling the H1 equipped with what DaimlerChrysler now contends is the Jeep grille.

## H. PROGRESSIVE ENCROACHMENT AND DILUTION

DaimlerChrysler also points to the doctrine of progressive encroachment, which allows a trademark owner to "tolerate de minimis or low-level infringements" and still have the right to "act promptly when a junior user either gradually edges into causing serious harm or suddenly expands or changes its mark." 5 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 31:21 (4th ed. 2001); *accord Independent Nail & Packing Co. v. Stronghold Screw Prods., Inc.*, 205 F.2d 921, 927 (7th Cir. 1953). There was no reason to complain of the Humvee grill, DaimlerChrysler says, because the Humvee was a military vehicle, and the H1 never sold more than 800 vehicles per year. This doctrine, DaimlerChrysler says, forgives any earlier failure to remonstrate about the Humvee/H1 grille—the threat to its mark did not "loom[ ] large." *Sara Lee Corp. v. Kayser-Roth Corp.*, 81 F.3d 455, 462 (4th Cir. 1996).

---

[12] For the same reasons, the court cannot agree with Daimler-Chrysler's parallel argument in its early briefs that the use of the intended H2 grille would exceed the scope of General Motors's trademark for the grille.

The court continues to believe that in light of the infancy of the federal anti-dilution act, it would be far too sweeping to say, as General Motors asked the court to hold on summary judgment, that the progressive encroachment doctrine never can apply in a dilution case. Nonetheless, having heard the parties' arguments and received evidence at the preliminary injunction hearing, the court is persuaded that the doctrine affords DaimlerChrysler's dilution claim no shelter in this case.

The thrust of DaimlerChrysler's progressive encroachment argument is that until General Motors announced plans to bring the Hummer into (or at least nearly into) the market in which DaimlerChrysler sells its Jeeps, there was no dilution. Before that moment, there was no lessening of the Jeep grilles' capacity to identify Jeeps for consumers. Until the federal anti-dilution act was adopted in 1996, state laws addressed dilution by non-competitors' use of marks. 4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 24:72 (4th ed. 2001) ("The legal theory of anti-dilution was not conceived to substitute for the likelihood of confusion rule when the parties are competitors."). The federal statute, however, specifically provides that dilution can occur "regardless of the presence or absence of . . . competition between the owner of the famous mark and other parties." 15 U.S.C. § 1127. DaimlerChrysler's argument would require the court to ignore that language and turn the original dilution doctrine on its head—dilution would not occur until the parties were in competition.

As is consistent with the statutory language, the test for likelihood of dilution ignores competition and looks solely to the marks' similarity and to the renown of the senior mark. *Eli Lilly & Co. v. Natural Answers, Inc.*, 233 F.3d at 468-69. Nothing in this record would allow a finding that the H2 grille is any more similar to famous Jeep mark(s) than were the Humvee grille in 1985 or the H1 grille in 1992, so

the advent of the H2 brings no change in the marks' similarity—the first factor in determining dilution. Nothing in this record would allow a finding that any Jeep grille design was any more renowned when this suit was filed in 2001 than in 1985 or 1992, so the impending H2 brings no change to the senior mark's renown—the other factor in determining dilution. In this case, then, the progressive encroachment doctrine simply does not apply to DaimlerChrysler's dilution claim.

## I. INFRINGEMENT

The progressive encroachment doctrine does, however, apply to DaimlerChrysler's infringement claim (there was no risk of confusion between the Wrangler and the Humvee or the H1), so the court thinks it most unlikely that General Motors's laches defense will succeed at trial against the infringement claim. To prevail on its trademark infringement claim, DaimlerChrysler will have to prove at trial that its trade dress—the CJ-2A grille—has acquired secondary meaning, and that the similarity of the intended H2 grille to that of DaimlerChrysler's causes a likelihood of consumer confusion as to source or affiliation of products. *Dorr-Oliver, Inc. v. Fluid-Quip, Inc.*, 94 F.3d 376, 380 (7th Cir. 1996).

Given the length of its consistent use on Jeep vehicles (now more than half a century), it is easy to conclude that DaimlerChrysler has a very high likelihood of proving that the CJ-2A grille design has acquired secondary meaning.[13]

---

[13] Dr. Ericksen's secondary meaning survey contains support for that proposition, but at this point, the court does not find that study persuasive standing alone. Dr. Ericksen's survey involved showing respondents the headlamps with the grilles. As discussed elsewhere in this opinion, DaimlerChrysler has defined the "Jeep grille design" as excluding the headlamps. The preliminary in-

(continued...)

DaimlerChrysler has not, however, shown a better than negligible likelihood of showing a likelihood of consumer confusion.

DaimlerChrysler concedes General Motors's point that consumers who pay $50,000.00 for H2s are unlikely to leave dealerships believing they purchased Jeeps. Daimler-Chrysler contends that two different sorts of confusion are likely: initial interest confusion, and source or sponsorship confusion. Unlike most commercial products that disappear from the public eye through consumption or private use, motor vehicles populate roads and highways for years after purchase. DaimlerChrysler argues that motor vehicles serve as rolling billboards that encourage more consumers to purchase the same model, and that consumers' on-road observations influence their short list of vehicles for possible purchase. DaimlerChrysler contends that the intended H2 grille likely will lead people who see the H2 on the road or in advertisements to think that the H2 is made or approved by, or somehow associated with, the Jeep brand. That belief may continue through the point of sale.

Likelihood of confusion is measured by: (a) the similarity of the trade dresses; (b) the area and manner of concurrent use, including the similarity of the products on which the trade dresses are being used; (c) the degree of care likely to be used by consumers; (d) the strength of DaimlerChrysler's trade dress; (e) evidence, if any, of actual confusion; and (f) any intent of General Motors to pass off its product as that

---

[13] (...continued)

junction record does not allow the court to determine a proper discount to apply to the Ericksen survey as a result of inclusion of the headlamps. It seems reasonable, though, that the greater a glimpse of the vehicle allowed to the respondent, the likelier the respondent will be to make a proper identification, particularly if the photo depicts a model of a brand that has sold nationally for more than fifty years.

of DaimlerChrysler. *Thomas & Betts Corp. v. Panduit Corp.*, 138 F.3d at 296.

*Similarity of Trade Dresses.* When the focus is on the CJ-2A grille rather than DaimlerChrysler's asserted family of marks, similarity with the intended H2 grille appears to be modest. The CJ-2A grille is a series of seven long, narrow, closely bunched slots; the intended H2 grille is a series of seven shorter, wider, and more widely spaced slots. In both grilles, the slots appear to be stamped through a planar surface. As indicated above, the court ignores the headlamp openings in making this comparison.[14]

Limiting the focus to the grille and ignoring all that surrounds the grille seems to blink the general rule that courts evaluate similarity in light of what happens in the marketplace, rather than just by making a side-by-side comparison. *Meridian Mut. Ins. Co. v. Meridian Ins. Group, Inc.*, 128 F.3d 1111, 1115 (7th Cir. 1997), *citing James Burrough Ltd. v. Sign of Beefeater, Inc.*, 540 F.2d 266, 275 (7th Cir. 1976). Consumers in the marketplace don't decide to buy an SUV solely because of the grille shown on a "Camp Jeep" poster or on a Jeep tie, or because of the grille shown on a coffee cup found in the "Hummer Stuff" catalog. Nonetheless, as explained earlier, DaimlerChrysler is entitled to define its trade dress, and the wearing of figurative blinders seems to be the only way to compare the similarity of the grilles.

---

[14] Were the headlamp openings considered, the front ends of the two vehicles would be less similar still. As mentioned before, the headlamp openings on the Jeep CJ-2A grille are aligned with the tops of the slots, but extend only about halfway down the height of the slots. The headlamp openings of the intended H2 grille are rectangular, with the top and bottom aligned with the tops and bottoms of the vertical slots.

George Mantis's confusion studies do not suggest confusion between the Jeep CJ-2A grille and the intended H2 grille. In his second confusion study, Mr. Mantis showed respondents photos of an H2 taken from directly in front, directly in back, and off the right front corner. In the set of photos shown to the control group, the seven-slotted grille had been altered to become a single large rectangular slot with silver letters spelling "HUMMER" across the slot. The "Hummer" name was prominently displayed in each of the three photos. In the earlier of the two dilution studies, Mr. Mantis used photographs of an H2 that were placed on the Internet before final design changes[15]; the earlier study used no control questions and attempted to measure dilution as well as confusion.

Neither of Mr. Mantis's confusion studies sheds light on the likelihood of confusion between the intended H2 grille and the Jeep CJ-2A grille. Mr. Mantis reported association with "Jeep," but at the time of the surveys, the Jeep Wrangler was (and had been for many years) the only Jeep model to use the CJ-2A grille. The Cherokee grille used from 1996 to 2000 (and not used before that time) appears to the court to be considerably more similar to the intended H2 grille, but since the court has found virtually no likelihood of DaimlerChrysler proving the existence of a family of marks in 1985, and since the seven-slotted Cherokee grille was not in use in 1985, association with the Cherokee grille proves nothing about the likelihood of confusion between the intended H2 grille and the Jeep CJ-2A grille.

For example, Mr. Mantis reported that in his earlier survey, 44% of the 228 surveyed Jeep owners associated a photo of the earlier version of the H2 with Jeep. A review of

[15] The only design change mentioned at trial was the addition of the letters "H-U-M-M-E-R" on the vertical pieces that define the slots in the grille.

the verbatim responses to the earlier survey (Daimler-Chrysler Exhibit 266, tabs G-I), though, leaves the strong impression that association was made only infrequently to the Jeep CJ-2A grille. Of the respondents who associated the H2 grille with Jeep, only six specifically mentioned an association with the Wrangler model, while thirty-four specifically mentioned an association with the Cherokee, the Grand Cherokee, or the Laredo (one respondent mentioned both Wrangler and Cherokee; one mentioned Tonka). The association with Wrangler actually was more frequent among respondents who didn't mention the grille at all—of those who reported association with Jeep for reasons other than the grille, six specifically mentioned the Wrangler, while five specifically mentioned a Cherokee variant (one mentioned Studebaker). Other respondents in both groups mentioned Jeep without mentioning a model.

Similarly, in his second confusion survey, Mr. Mantis reported a net[16] 7.0% of consumers to have confused the H2 with Jeep.[17] Again, reference to "Jeep" is too broad, since the Jeep CJ-2A grille is the only mark that General Motors

---

[16] Mr. Mantis employed a control group in his second survey, so the "net" figure reports the difference between those who confused the H2 with Jeep (the test group) and those who confused a third-party's vehicle with Jeep (the control group).

[17] To that figure, DaimlerChrysler adds another net 1.9% of respondents who confused the H2 for "other Jeep appearance-related reasons," and claims a net confusion figure of 8.9%. As noted earlier, DaimlerChrysler defined the trade dress it seeks to protect as the grille, and only the grille. No logical reason comes to mind why those who associated with Jeep some part of the H2 other than the grille disclose anything about likelihood of confusion based on the grille. Indeed, Mr. Mantis included in the 7.0% anyone who mentioned the H2's "front end" without mentioning the grille. The "front end" of the H2 includes features such as headlamp openings that are not alleged to infringe on, or dilute, DaimlerChrysler's mark.

can be accused of infringing. A review of the verbatim responses shows that of the forty-two respondents who referred to the Jeep appearance when shown an H2, not one specifically mentioned the Wrangler; only six mentioned any specific Jeep model.

To be sure, these comments do not mean that the Mantis surveys disprove any likelihood of confusion. Mr. Mantis's surveys were not designed to measure confusion with the grille then seen only on the Jeep Wrangler (and now on the Liberty, too), and the court has too little expertise in statistics to decide whether the figures set forth in the preceding two paragraphs prove anything at all. For purposes of today's ruling, though, it is enough to say that neither of these two studies—one in which five of 218 respondents (2.2%) associated the H2 front end with the Jeep Wrangler, and another in which none of 215 respondents did so—support the proposition that the intended H2 grille is sufficiently similar to the Jeep CJ-2A grille to make consumer confusion at all likely.

*Area and Manner of Concurrent Use.* Besides the Wrangler, the new Jeep Liberty (which replaced the Cherokee in 2001) might be said to use the CJ-2A grille design. The Wrangler, Liberty, and H2 all are sport utility vehicles that will be sold at car dealerships. Beyond that, however, there is little overlap between the DaimlerChrysler products and the General Motors product. The H2 almost invariably will cost more than $50,000.00, while the Wrangler and Liberty usually sell for no more than $28,000.00 (with the Wrangler available for as little as $16,000.00, and the Liberty selling for around $17,200.00 at the low end). As DaimlerChrysler measures such things, the Wrangler is categorized as a small SUV; the Liberty is in the lower-middle sized category of SUVs; the H2 is in the large category.

The Wrangler and Liberty ordinarily are sold at Jeep (or DaimlerChrysler) dealerships, while the H2 (and the H1) will be sold at General Motors (or Hummer) dealerships. In a few instances, no doubt, the same dealership may handle Jeeps and Hummers, but there is little likelihood of consumers confusing the products on the showroom floor. The differences in headlamp configuration already have been noted; while the front tires and fenders are set outside the headlamps on the Wrangler and Liberty, the tires on the H2 are directly below the headlamps, and the H2 appears to have no front fenders.

More important, though, are the differences in size: the H2 is seven inches taller than the Wrangler and the Liberty (and one to three inches taller than the H1); the track width of the H2 is nine inches wider than the Liberty and nearly a foot wider than the Wrangler (but two inches narrower than the H1); the overall width of the H2 is just under a foot more than the Liberty's and more than fourteen inches greater than the Wrangler's (though five inches narrower than the H1[18]); while a vehicle's length is not apparent from a head-on view, a consumer who walks around the vehicles on the showroom floor will find the H2 to be fifteen inches longer than the Liberty, and a whopping three feet longer than the Wrangler—and five inches longer than the H1. In every dimension, the H2 is decidedly larger than any Jeep that uses the CJ-2A grille.

As noted earlier, DaimlerChrysler doesn't contend that consumers will drive off dealership lots thinking the H2 they just bought for $50,000.00 or more is a Jeep Wrangler. DaimlerChrysler's concern is what happens before and after the sale. Motor vehicles rolling down the highways are free commercials: consumers notice nice-looking cars and SUVs,

[18] General Motors found it necessary to reduce the width so the H2 could use commercial car washes.

and recall them when considering purchase of a new vehicle. DaimlerChrysler believes that a motoring consumer (or one looking at true advertisements) who sees an H2 will think the H2 is made by, or somehow associated with, Jeep.

DaimlerChrysler is correct that if General Motors's sales predictions are correct, the roads soon will be inhabited by H2s, Libertys, and Wranglers. As already discussed, though, this record contains no persuasive evidence to warrant DaimlerChrysler's fear that the intended H2 grille will confuse the consumer into association with the CJ-2A grille on the two Jeep models. To the extent any such association might arise, it does not amount to the sort of post-sale confusion that supports an infringement action. None of the relevant motor vehicles is the sort of low-priced item to which a consumer might devote little careful thought, such as a broom, *Thomas & Betts Corp. v. Panduit Corp.*, 138 F.3d at 297, or a story book that might be purchased on impulse to distract a fussy child. *Western Publ'g Co. v. Publications Int'l, Ltd.*, No. 94 C 6803, 1995 WL 1684082, at \*14 (N.D. Ill. May 2, 1995). Any similarity in the grilles does not present a risk of a "bait and switch" effect. *See Syndicate Sales, Inc. v. Hampshire Paper Corp.*, 192 F.3d at 638 ("the Lanham Act forbids a competitor from luring potential customers away from a producer by passing goods off as those of the producer, even when confusion as to the source of the goods is dispelled by the time the sale is consummated. Such 'bait and switch,' also known as 'initial interest' confusion, will affect the buying decisions of the consumers when it permits the competitor to 'get its foot in the door' by confusing the consumers. When post-sale inspection of the goods is an ineffective remedy, such an approach makes sense."); *Dorr-Oliver, Inc. v. Fluid-Quip, Inc.*, 94 F.3d 376, 382 (7th Cir. 1996); *cf. Rust Environment & Infrastructure, Inc. v. Teunissen*, 131 F.3d 1210, 1217 (7th Cir. 1997).

*The Degree of Care Likely to Be Used by Consumers.* For the reasons just set forth, this factor weighs against a finding of likely confusion. Visual similarity may have greater importance when the products are low-priced items not likely to receive considerable study from the consumer, *Roulo v. Russ Berrie & Co.*, 886 F.2d 931, 937 (7th Cir. 1989) (greeting cards), but the consumer's high sophistication does not foreclose confusion. *Schwinn Bicycle Co. v. Ross Bicycles, Inc.*, 870 F.2d 1176, 1187 (7th Cir. 1989). Further, that an H2 buyer might understand that the product is a Hummer does not eliminate possible confusion as to whether DaimlerChrysler is the source of manufacture or affiliated with the manufacturer. *Rolls-Royce Motors, Ltd. v. A & A Fiberglass, Inc.*, 428 F. Supp. 689, 694 (N.D. Ga. 1977).

Still, consumers who buy or lease a vehicle that sells for more than $16,000.00—or, in the case of the H2, more than $50,000.00—are likely to use a very high degree of care, especially since they are likely to make their purchases from well-branded dealerships.

*The Strength of DaimlerChrysler's Trade Dress.* The traditional method of measuring a mark's strength with a yardstick that runs from generic at one end to arbitrary and fanciful at the other is a clumsy method when measuring the strength of trade dress or product design. *Landscape Forms, Inc. v. Columbia Cascade Co.*, 113 F.3d 373, 380 (2d Cir. 1997). The issue of strength is not a difficult one here: DaimlerChrysler has used the CJ-2A grille in commerce continuously for more than half a century, and has promoted it heavily. The CJ-2A grille has considerable secondary meaning, and is a strong mark.

Concern with the strength of the mark, though, looks more to the extent of protection to be afforded it than to the likelihood of confusion:

The greater the distinctiveness of the mark, the greater the likelihood that prospective purchasers will associate the same or a similar designation found on other goods . . . with the prior user. "Strong" marks that have a high degree of distinctiveness are thus protected against the use of similar marks on a wide range of goods or services that are "weak" designations that have less distinctiveness or market recognition.

*Restatement (Third) of the Law of Unfair Competition*, § 21, comment I (1995). This factor, then, weighs in favor of injunctive protection of DaimlerChrysler's strong mark, if there is other evidence of likely confusion.

*Evidence of Actual Confusion.* The record contains no evidence of actual confusion. That lack of evidence favors neither party since General Motors is not yet selling the H2. No evidence of actual confusion reasonably could be expected.

*Any Intent of General Motors to Pass off the H2 as That of DaimlerChrysler.* "'Passing off' means fraud; it means trying to get sales from a competitor by making consumers think that they are dealing with that competitor, when actually they are buying from the passer off." *Blau Plumbing, Inc. v. S.O.S. Fix-It, Inc.*, 781 F.2d 604, 610 (7th Cir. 1986). The record contains no direct evidence that General Motors intends to do anything other than to introduce a new model of large SUV, with the possibility of introducing smaller versions in years to come. The intent to compete is not the intent to pass off the product as the competitor's.

DaimlerChrysler points to General Motors's advertising as circumstantial evidence of an intent to pass off, or at least to foster confusion among consumers. Daimler-Chrysler points to General Motors's use of advertising

slogans that make reference to a "legend" surrounding the H2's predecessors, a "legend" of which the H2 supposedly is to become a part. DaimlerChrysler's suspicions on this point are understandable: General Motors has run advertisements for the H2 that say, "The Legend Continues"—a slogan that DaimlerChrysler used in new Jeep product launches in 1991, 1995, 1996, 1997, 1999, and 2001. To a lesser extent, Jeep and H2 advertising have shared a "go anywhere, do anything" theme.

DaimlerChrysler claims no trademark infringement in General Motors's use of the "The Legend Continues" slogan, but inference of an intent to pass off or to confuse would be nearly irresistible if General Motors had initiated the use of a slogan repeatedly used for new Jeeps over the past decade. General Motors, however, did not initiate the use of the slogan for Hummers. AM General dubbed its Humvee a "legend" very soon after Operation Desert Shield, and AM General's early advertising for the H1 spoke of "The New American Legend" (1991) and "The Legend Grows" (1992). General Motors continued the use of the existing "legend" theme for the Hummer line. Under these circumstances, no inference can be drawn that General Motors chose the "legend" advertising slogans with any intent to trade on consumers' association with the Jeep "legend," as opposed to the intent to trade on consumers' association with the Humvee/H1 "legend."

DaimlerChrysler points to another aspect of General Motors's advertising. In many advertisements, General Motors features the H2's front end—the grille, as DaimlerChrysler sees it—from a head-on view (or, in a recent advertisement, from ground level—the "road kill perspective," as DaimlerChrysler's counsel memorably described it). DaimlerChrysler says it has long used such head-on views to advertise Jeeps, and that advertising from that perspective is rare in the industry. This, DaimlerChrysler says, is

indication of General Motors's intent to confuse consumers as to the source of Hummers.

Again, the argument would be stronger had this perspective originated with General Motors, but it did not. AM General used the head-on view in much of its advertising. Perhaps more importantly, so did others. In the 1990s, firms outside the automotive industry[19] used the Humvee (with AM General's permission) in their own advertisements that sought to associate attributes of their own products with the Humvee. Several of those advertisements employed the perspective to which DaimlerChrysler now points the court. Had those advertisers wished to associate their products with Jeeps, they could have used Jeeps in their ads (and, for all the court knows, they might have done so). Those third-party advertisers debunk any inference that General Motors uses head-on views of the H2 for the purpose of associating its product with Jeep.

Nothing in the record indicates any intent on General Motors's part to palm off the H2 as a Jeep, or to exploit consumers' associations with Jeep. This factor weighs against any likelihood of confusion.

*Cumulative Effect of All Factors.* In sum, the only factor that might support a finding of likely confusion is the strength of the CJ-2A grille as a source of identification with DaimlerChrysler. The facts just addressed with respect to General Motors's intent, however, sharply pare any weight of that factor in deciding likelihood of confusion. Third parties' use of the Humvee's front end indicates that the Humvee's front end (and, inferentially, the H1's front end) has developed its own secondary meaning. If so, and

---

[19] Such firms included Panasonic, CVIC World Markets, Master-Card, Rainier Beer, IBM, and Arrowhead Water.

recognizing the dissimilarity of the H2 and the Wrangler or Liberty when viewing anything other than the grille, the H2 grille is much more likely to trigger consumer association with the Humvee (as it was designed to do) than to threaten the strength of the CJ-2A grille configuration as a DaimlerChrysler mark.

DaimlerChrysler has less than a negligible chance of succeeding on the merits of its trademark infringement claim. Because, for the reasons discussed much earlier in this memorandum, DaimlerChrysler also has less than a negligible chance of succeeding on the merits of its trademark dilution claim, its motion for preliminary injunction must be denied. *See, e.g., Kiel v. City of Kenosha*, 236 F.3d 814, 816 (7th Cir. 2000) ("Kiel has so little chance of success on the merits of his case that the granting of a preliminary junction [sic] in this instance would be inappropriate."); *Teamsters Local Unions Nos. 75 and 200 v. Barry Trucking, Inc.*, 176 F.3d 1004, 1011 (7th Cir. 1999) ("Without demonstrating a reasonable likelihood of success on the merits of either claim, Barry failed to satisfy the all important first element of *Roland*, and we therefore need not consider the other four elements.").

## J.  BALANCE OF HARMS

That DaimlerChrysler has shown no likelihood of success on the merits is reason enough to deny the motion for preliminary injunction without further discussion. *Platinum Home Mortgage Corp. v. Platinum Financial Group, Inc.*, 149 F.3d 722, 730 (7th Cir. 1998) ("a district court may decline to address the remaining elements of a preliminary injunction if a plaintiff fails to demonstrate a reasonable likelihood of prevailing on the merits of the underlying claim."), *citing Ping v. Nat'l Educ. Assoc.*, 870 F.2d 1369, 1371 (7th Cir. 1989). Nonetheless, since the evaluation of a motion for preliminary injunction is intended to reduce the

cost of error in determinations made before complete discovery and trial, *Platinum Home Mortgage Corp. v. Platinum Financial Group, Inc.*, 149 F.3d at 726, *quoting Faheem-El v. Klincar*, 841 F.2d 712, 717 (7th Cir. 1988), the court alternatively assumes, solely in consideration of reducing the risk of error, that DaimlerChrysler might have a better than negligible chance of success on the merits. For the reasons already discussed, the chance of success would be low, but the court recognizes that bright lines do not always mark the difference between no chance and slight chance. Accordingly, while the court holds that Daimler-Chrysler does not have a better than negligible likelihood of success on the merits, the court addresses the remaining factors in the preliminary injunction analysis.

A better than negligible chance of success is not all that DaimlerChrysler must show to reach the balancing phase of the analysis, but for reasons to be discussed in the balancing phase, DaimlerChrysler has shown that it has no adequate remedy at law—in other words, that an eventual award of money damages would not satisfy its injury, *Praefke Auto Electric & Battery Co., Inc. v. Tecumseh Prods. Co., Inc.*, 255 F.3d 460, 462 (7th Cir. 2001)—for dilution and/or infringement of its mark (which might consist of a family of marks, given the court's assumption of its own error), and that if the preliminary injunction is not issued, it will suffer irreparable harm before the lawsuit's final resolution.

Once DaimlerChrysler is assumed to have shown a reasonable probability (a better than negligible chance) of success on the merits, irreparable harm without the preliminary injunction, and absence of an adequate remedy at law, the court then must consider any irreparable harm the preliminary injunction might impose upon General Motors if the preliminary injunction is issued, and whether the preliminary injunction would harm or foster the public interest. *Anderson v. U.S.F. Logistics (IMC), Inc.*, 274 F.3d

470, 474 (7th Cir. 2001); *Re/Max North Central, Inc. v. Cook*, 272 F.3d 424, 429-430 (7th Cir. 2001).

The court appraises the risk of irreparable harm to the parties not simply by reference to what they will lose by an unfavorable ruling today, but rather by reference to the harm of error: what irreparable harm would denial of a preliminary injunction cause to DaimlerChrysler and the public if the trial reveals that DaimlerChrysler is entitled to relief; and what irreparable harm will the granting of an injunction do to General Motors and the public if the trial reveals that DaimlerChrysler is not entitled to relief? Once those evaluations are made, the court balances likelihood of success and the risk of irreparable harm on a sliding scale: the better a party's chances of winning at trial, the less the balance of harms needs to favor that party. *Ty, Inc. v. The Jones Group, Inc.*, 237 F.3d 891, 895 (7th Cir. 2001); *Eli Lilly & Co. v. Natural Answers, Inc.*, 233 F.3d at 461.

If, as the court assumes for this portion of the analysis, DaimlerChrysler has a better than negligible chance of success on the merits of either or both of its trademark claims, its chance of success is slight. Accordingly, the sliding scale requires that the balance of harms weigh heavily in DaimlerChrysler's favor. It does not do so.

If the court allows General Motors to use the intended H2 grille and it later develops that the use of that grille dilutes or infringes on DaimlerChrysler's mark(s), DaimlerChrysler will have suffered significant irreparable harm. The Jeep grille design no longer will serve as a unique identifier of Jeep vehicles; to the extent consumers are misled by the H2 grille, the goodwill that the Jeep brand has developed in the Jeep grille design for the past fifty-six years will suffer. The loss of so venerable a brand identifier and goodwill would impact DaimlerChrysler in the marketplace in ways presently unpredictable, except for the certainty that those effects would be negative. Those harms "are by their very

nature irreparable and not susceptible of adequate measurement for remedy at law," *International Kennel Club, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1092 (7th Cir. 1988), and irreparable harm is presumed whenever a trademark is infringed and diluted. *Eli Lilly & Co. v. Natural Answers, Inc.*, 233 F.3d at 469.

If DaimlerChrysler's Jeep sales are reduced as a result of that harm, its production also will drop, and DaimlerChrysler employees (some of whom work in Indiana, though the court's focus is not limited to a single state) will lose jobs in an unpredictable number. Consumers also would be harmed: an injunction against trademark dilution or infringement protects consumers from confusion and also protects a trademark owner's right to maintain a mark's unique association with its products. *International Kennel Club, Inc. v. Mighty Star, Inc.*, 846 F.2d at 1092; *Nabisco v. PF Brands*, 191 F.3d 208, 217 (2d Cir. 1999).

The harm to General Motors can be no less than the presumed harm to DaimlerChrysler. If DaimlerChrysler has only a slight chance of proving at trial that the intended H2 grille dilutes or infringes on DaimlerChrysler's mark, an injunction against use of the intended H2 grille most likely would deprive General Motors of the use of its own intellectual property rights in the registered Hummer front end trademark. General Motors and the consuming public would suffer the same sort of irreparable harm set forth in the preceding paragraphs if the court deprives General Motors of what is very likely to be found to be General Motors's own mark.

The harm to General Motors would be far greater, though the additional harm might not be entirely irreparable. General Motors has invested $700 million in the H2 project. General Motors has presented models of H2 (with its intended grille) at auto shows in Detroit and Los Angeles, and then-New York Mayor Rudy Giuliani and Arnold

Schwarzenegger participated in the H2's highly-publicized introduction in New York. Twenty million people have attended auto shows in which the H2 concept and production vehicles were displayed. The unveiling and launch have been heavily advertised (General Motors has spent $20 million on advertising[20]), and the advertising materials depict the intended H2 grille. On the weekend during the preliminary injunction hearing, an H2 was auctioned off for Arnold Schwarzenegger's charity, and was sold for $125,000.00. Michael DiGiovanni, general manager of General Motors's Hummer division, estimated at trial that when the cost of a re-launch campaign, curative advertising, and damaged goodwill are considered, an injunction against the intended H2 grille would cost General Motors $268 million. If amounts are added for losses incurred by dealerships and the expense of recalling licensed die cast toys, Mr. DiGiovanni estimated that the cost to General Motors would range from $500 million to $1 billion.

About $250 million of General Motors's expense in preparing for the H2 went to finance the building of a new AM General plant, where the H2 is to be assembled. As much as General Motors stands to lose if use of the intended H2 is enjoined, the blow to the much smaller AM General and the community around it would be greater. About thirty-five percent of AM General's income in the coming years is to be from the H2 project. General Motors believes it can sell 40,000 H2s per year, and the new H2 plant is designed to meet that demand. Such a plan requires a large area and a large, stable workforce.

General Motors's sales estimates led local and state governments to the conclusion that the new H2 plant would

---

[20] Much of this sum, of course, was spent during the pendency of the lawsuit, and so with full knowledge that the eventual H2 might require a different grille.

bring $477.5 million in new annual sales to Indiana businesses. As a result, the local and state governments made extraordinary arrangements to facilitate the building of the plant, including buying area homes. Word of new jobs went forth, and AM General received 10,000 applications for hourly positions, and another 10,000 for salaried positions. At the time of the hearing, 471 AM General employees were assembling H2s at the new plant; other AM General employees-to-be had given notice to their current employers, and some were in the process of relocating their families to start work at the new plant. By August, if no injunction is issued, 1,000 people will be working in the new plant. Operation of the new plant now costs AM General $4.2 million per month; that figure is expected to increase to $10 million per month by late summer. AM General has spent more than $30 million in recruiting, screening, testing, hiring, and training the H2 plant workforce. To facilitate the H2 project, the union that represents the hourly workers agreed to a ten-year labor agreement.

If General Motors is enjoined from selling vehicles with the intended H2 grille and ultimate resolution is delayed until trial (which is as yet unscheduled, but which the scheduling order contemplates to take place some time in or around December), AM General will have to close its new plant. Since AM General is paid (and repays its loan) only for assembled vehicles that it delivers to General Motors, it will lose an enormous amount of the 2002 income that was expected to constitute more than a third of the company's overall income. Hundreds of people will lose their jobs, and the overall economic loss to the new plant's community will be enormous and unmeasurable.

None of what the court just set forth would be changed if General Motors were to choose to use the "painted grille" that was the subject of much of the information presented at the preliminary injunction hearing. Some time after this case began, General Motors designers were told to try their

hand at designing a grille that could be used on the H2 if the court enjoined use of the intended H2 grille. Daimler-Chrysler stumbled upon that information late in discovery. The grille is depicted in General Motors Exhibit 320.

The alternative grille design would use the same seven-slotted grille that is now being produced for the H2, but would call for the grille to be painted so as to blacken out the top and sides of the slots, producing an optical illusion in which the eye sees eight "floating bars" instead of the seven slots.[21] DaimlerChrysler does not contend that the painted grille would dilute or infringe its mark or family of marks.[22] DaimlerChrysler argues that if General Motors adopted the painted grille as the grille for the H2, production of the H2 would be delayed for no more than six to eight weeks, and there might be no delay at all if General Motors were to forego some testings procedures that

---

[21] To the court's untrained eye, the two grilles look very similar when seen side-by-side. *See* General Motors Exhibit 320. When the court looks at two vehicles with the grilles, however, the vehicles themselves look very different. *See* General Motors Exhibit 322.

[22] General Motors complains that DaimlerChrysler took too long to disclose its position on whether the painted grille dilutes or infringes. That argument is frivolous in light of serial obstacles that General Motors threw onto DaimlerChrysler's decisional path— first developing it without the knowledge of its Hummer division or AM General (the likely pool of deponents in this case), then disclaiming its existence, then claiming a work-product privilege until ordered to produce the information, then providing a photograph from which DaimlerChrysler could not tell what the grille looked like, then refusing to provide another photograph, which in turn required DaimlerChrysler to employ computers to figure out what the grille looked like. Perhaps General Motors acted properly at each turn, or perhaps it didn't; the court need not decide that issue. But to accuse DaimlerChrysler of taking too long to say what it thinks of the painted grille is simply nonsense.

DaimlerChrysler says General Motors has waived in other instances.

General Motors disagrees with each aspect of Daimler-Chrysler's argument on the painted grille. The General Motors witnesses—and it should be noted that none of those witnesses claimed to be final decision-makers on any of these issues—said that General Motors would never waive quality control procedures on a part that is so conspicuous on a $50,000.00 vehicle. The six-to-eight week figure, General Motors notes, was best-case scenario based on an assumption that the grille supplier would "hit a home run" in shifting to the painted grill, and actual delay would likely be longer—perhaps even much longer.

Most fundamentally, says General Motors, the painted grille probably would never be accepted as an option. The head of the Hummer division and the president of AM General both said they would strongly recommend against the painted grille's use because it betrays the vehicle's Humvee heritage. They say they would recommend that General Motors put the project on hiatus (and close down the H2 plant) and try to win at the December trial. DaimlerChrysler notes that General Motors has not made a final decision, and in light of the high-risk strategy that General Motors has shown at times in this case, the court cannot discount the possibility that General Motors is, as DaimlerChrysler's counsel charged in final argument, "holding a gun to its own head and to the head of this community and daring the court to pull the trigger."

Nevertheless, the court believes it to be more likely than not that General Motors would not use the painted grille were it temporarily enjoined from using its intended H2 grille. General Motors has invested hugely in promotion, and has led consumers to expect a vehicle of a Humvee-like appearance. Mr. DiGiovanni testified to his belief that between advertisements and auto shows, General Motors has

generated 500 million "impressions" around the H2 (which the court understands to mean people thought to have been exposed to a promotion or advertisement) that would have to be corrected if a different grille were used. The use of any different grille, even if accompanied by hundreds of millions of dollars in advertising to modify those impressions, Mr. DiGiovanni opined, could cost General Motors five to ten percent of its anticipated H2 sales—some $500 million over two and a half years.

That estimate assumes that the market for the remaining ninety to ninety-five percent of sales viewed the painted grille as being sufficiently consistent with the original Humvee to remain prospective purchasers. General Motors has done no consumer research to test that hypothesis. Perhaps, as DaimlerChrysler says, General Motors should have done such research by now—there was certainly enough time to do so. The question for the court, though, is what is likely to ensue if the preliminary injunction is issued, and the court is persuaded that as long as a ten-month delay might solve the problem, General Motors would not roll out H2s that risk consumer rejection either because the H2s have a grille that is unattractive to potential purchasers, or because the H2s have a grille that differs from what potential purchasers were led to expect, or because of both reasons.

General Motors has made decisions that increased the prospective losses that would flow from an adverse decision on this motion. General Motors responds that it should not have been expected to knuckle under to what it viewed as unreasonable demands of DaimlerChrysler; reasonable minds might agree or disagree with that proposition. Nevertheless, those decisions were made by General Motors, not by AM General or its new employees—and the harm that an injunction would wreak on them is not of their own making. Further, even setting aside the high-stakes decisions General Motors has made during the pendency of

this suit, it remains that a preliminary injunction would be quite likely to harm irreparably General Motors's intellectual property and consequently to do irreparable harm to the public's right to identify products. *Nabisco v. PF Brands*, 191 F.3d at 217; *International Kennel Club, Inc. v. Mighty Star, Inc.*, 846 F.2d at 1092.

Accordingly, even if DaimlerChrysler is assumed to have some likelihood of success on the merits of its dilution and/or infringement claims, the balance of irreparable harms to the parties and others weighs enormously against the requested injunction.

## K. CONCLUSION

For these reasons, the court finds that DaimlerChrysler's motion for a preliminary injunction must be denied because (1) DaimlerChrysler has virtually no chance of proving at trial that it had a "family of marks"—grilles with seven to ten vertical slots that appear to be stamped from a planar surface, all of which identify vehicles as Jeep models—when AM General began selling the Humvee with the grille that General Motors intends to use on the H2; (2) DaimlerChrysler waited far too long to contend now that the H2 grille dilutes the uniqueness of the grille now in use on the Jeep Wrangler as an identification of the Wrangler's source; and (3) DaimlerChrysler has virtually no chance of showing a likelihood of consumer confusion between the Jeep Wrangler and the H2.

The court also finds that even if DaimlerChrysler had shown some chance of winning at trial on one or both of its claims, a preliminary injunction still would not be appropriate in light of the harm that General Motors, AM General, and the public would suffer if the injunction were issued and DaimlerChrysler lost at trial.

Accordingly, the court DENIES DaimlerChrysler's request for preliminary injunction (filed July 13, 2001).

SO ORDERED.

ENTERED:  February 28, 2002

A true Copy:

      Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*